See also, Bkrtcy., 64 B.R. 620.

**In re BELL & BECKWITH, Debtor(s).**

**Patrick A. McGRAW, Trustee, Plaintiff(s),**

v.

**Gary YELVERTON, et al., Defendant(s).**

**Bankruptcy No. 83–0729.**
**Related Case: 83–0132.**

United States Bankruptcy Court, N.D. Ohio, W.D.

Nov. 20, 1986.

Fuller & Henry, Toledo, Ohio, for plaintiff.

William L. McGimsey, Las Vegas, Nev., for defendant Baldwin.

R. Paul Sorenson, Las Vegas, Nev., for defendants Yelverton.

Hunter & Schank, Toledo, Ohio, for defendants Yelverton.

MEMORANDUM OPINION
AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court upon the Complaint To Sell Free and Clear of

Liens filed by the Trustee in the above entitled adversary action. The property addressed by the Complaint has been sold, and the Trustee has received a portion of the purchase price from the buyer. At the time the property was sold, it was recognized by the parties to this action that the property was subject to competing interests, and that the extent of those interests could not be determined prior to the time of sale. However, because a buyer had been located, the parties agreed that the property could be sold subject to a subsequent determination by this Court of the parties' interests.

Pursuant to that agreement, the property was sold to the prospective purchaser. However, the parties' agreement required the Trustee to have prepared by an independent party an appraisal of the property and an allocation of interests. The Trustee has had this allocation accomplished and has, pursuant to the agreement, submitted the report to this Court for approval. The Defendants Sandy and Gary Yelverton (hereinafter the Yelvertons) have objected to the Trustee's proposed allocation and have asked this Court to make a determination as to the extent of their interest in the property.

This Court conducted a hearing relative to the Trustee's proposed allocation and the Yelvertons' Objection thereto. At that hearing the parties had the opportunity to present any evidence and arguments they wished the Court to consider. The parties have also filed post-hearing arguments, and have had the opportunity to respond to the arguments presented by opposing counsel. The Court has reviewed the evidence, the arguments, and the entire record in this case. Based upon that review and for the following reasons the Court finds that the Yelvertons have a five percent (5%) interest in the proceeds allocatable to the Trustee for his assigned ownership interests in the property.

## FACTS

Prior to February 5, 1983, Edward P. Wolfram, Jr., was the managing partner of a partnership known as Bell & Beckwith, a stock brokerage doing business in Toledo, Ohio. On February 5, 1983, a petition was filed by the Securities and Exchange Commission in the United States District Court for the Northern District of Ohio, Western Division, which ultimately placed the brokerage in liquidation under the provisions of 15 U.S.C. 78aaa *et seq.* The petition was filed as the result of an unlawful course of conduct carried out by Edward P. Wolfram, Jr., wherein he systematically diverted funds from the accounts of the brokerage's customers to his own purposes.

During the course of his illegal activities, Edward P. Wolfram, Jr., used the diverted funds to become involved in a number of diversified ventures. Included in these ventures was the purchase of the Landmark Hotel and Casino (hereinafter LHC) in Las Vegas, Nevada. The evidence reflects that on or about February 24, 1978, a sales agreement for the sale of the LHC was executed by the Summa Corporation (hereinafter Summa), as seller, and by Zula Wolfram (the wife of Edward P. Wolfram, Jr.) (hereinafter Wolfram), Lou Tickel, and Jo Ann Tickel (hereinafter Tickels) as purchasers. The deed which affected the transfer of title to the LHC reflects that Wolfram received an undivided one-half interest in the property. The Tickels collectively received the remaining undivided one-half interest. In return for a promissory note executed by the purchasers, Summa became the beneficiary of a deed of trust in the LHC. Under the terms of sale, the purchasers were to make to Summa monthly payments of One Hundred Thirty-three Thousand Five Hundred Forty-eight and 75/100 Dollars ($133,548.75) for a period of one hundred twenty (120) months. At the expiration of that time, the unpaid balance of the purchase price would become due.

On or about April 1, 1978, a partnership agreement was executed by Wolfram, the Tickels and the Yelvertons. As a result of this agreement, a partnership known as Mark III Partnership (hereinafter Mark III) came into existence. As stated in the

partnership agreement, the purpose of the partnership was to own, operate, manage and/or lease the LHC. The agreement also stated that Wolfram, the Tickels, and the Yelvertons were to have a one-third interest in the partnership. Although the agreement makes a general recitation as to the consideration offered in exchange for the formation of the partnership, the nature, extent, and value of that consideration is not clear. However, it does not appear that the LHC was ever transferred by deed from Wolfram and the Tickels to Mark III.

On September 28, 1979, the Tickels transferred to Wolfram their one-half interest in the LHC, thereby making Wolfram the owner of the entire property. Although the transaction does not appear of record in this case, it appears that the Tickels also transferred to Wolfram their one-third interest in Mark III. It further appears that the Yelvertons transferred to Wolfram all but 5% of their interest in Mark III, thereby making Wolfram the owner of ninety-five percent (95%) of the partnership. In addition, the record indicates that at the time Mark III was being restructured by the foregoing transactions, one Gary Baldwin (hereinafter Baldwin) was given an option to purchase an interest in the partnership. The parties have agreed that this option was never exercised. Finally, in what appears to be an unrelated transaction, Wolfram, on April 10, 1980, transferred to Passport Travel, Inc. (hereinafter Passport) an 18.7% ownership interest in the LHC. With the exception of its ownership interest in LHC, Passport appears to be unrelated to these proceedings.

Despite the absence of a conveyance and in furtherance of the partnership's stated purpose, it appears that Mark III began to exercise dominion over the LHC. This control over the property began shortly after the partnership's formation. However, at about that same time, a corporation known as Mark III Corporation (hereinafter Mark III Corp.) was formed. The stated purpose of Mark III Corp. was for the operation of the hotel facilities at the LHC. While it appears that Wolfram had a controlling interest in Mark III Corp., the names of the shareholders in Mark III Corp. and the extent of their interests is not set forth in the record.

Shortly after the formation of Mark III Corp., a second corporation, TZ Enterprises, Inc. (hereinafter TZ), was formed. The stated purpose of TZ was to operate the casino facilities at the LHC. It should be noted that TZ was a wholly owned subsidiary of Mark III Corp.

From the time of their inception, it appears that both Mark III Corp. and TZ began to operate the LHC facilities without any formal authorization from either Mark III or the titled owners. However, on March 18, 1981, a lease was executed between Mark III Corp. and Mark III. Under this purported agreement, Mark III Corp. agreed to lease the LHC from Mark III for a period of forty years. In return for the right to occupy the premises, Mark III Corp. agreed to pay to Mark III monthly payments that were equal in amount to the monthly payments owed by the owners of the LHC to Summa. While it does not appear of record, it appears that Mark III Corp., also executed a separate lease with Passport for occupancy of its portion of the LHC.

Subsequent to the execution of these lease agreements, Mark III Corp. and TZ continued their occupancy and operation of the LHC. During these times, the corporations purchased furnishings used in their operations, maintained an ongoing workforce, added fixtures to the premises, and upheld the goodwill of the business. It should be noted that under the terms of the leases, any fixtures installed by the tenants would revert to the lessors upon expiration of the lease.

As was previously indicated, liquidation proceedings were commenced against the Debtor on February 5, 1983. In an effort to return to the estate assets which had been unlawfully diverted from the brokerage, both Edward P. Wolfram Jr., and Zula Wolfram assigned to the Debtor any interests they had in the LHC and its related

entities, including Mark III, Mark III Corp., and TZ. It also included the execution of a deed of Wolfram's interest in the LHC.

As a part of his effort to liquidate assets of the estate, the Trustee initiated the above entitled adversary action. The purpose of this case is to sell the LHC free and clear of any interests which may exist in the property. The Yelvertons have been named as defendants in this case as the result of the fact that they have claimed a five percent (5%) ownership interest in the LHC. Baldwin was also named as a defendant as the result of his claimed option interest in Mark III.

During the early stages of this proceeding, the parties seriously contested the validity of both the Yelvertons' and Baldwin's claims. However, the parties recognized that litigation of these claims would, if carried to completion, jeopardize the Trustee's efforts to sell the property. As a compromise, the parties reached an agreement, whereby the Yelvertons would execute to the Trustee a quitclaim deed for any interest in the LHC. In return, the Trustee agreed that:

> "The proceeds of the sale ... shall be distributed among the sellers in accordance with the allocation approved by the Court. Of the net proceeds allocated and payable directly to the Trustee, after deduction of all expenses ... of sale, Gary and Sandy Yelverton shall receive five percent (5%) ..."

The allocation and appraisal referred to in the settlement was to be conducted by an independent third party. The purpose of this allocation was to assess the value of the respective parties' interests in the LHC. This allocation would serve as the basis upon which the proceeds of sale would be divided among the entities which had an interest in the property, including the Yelvertons.

In addition to the Yelvertons' compromise, the Trustee entered into an agreement with Baldwin respecting his claimed interest in the property. Under this accord, the Trustee paid to Baldwin the sum of One Hundred Seven Thousand and no/100 Dollars ($107,000.00). In return for this payment, Baldwin agreed to forego any claim to the LHC. It should be noted that as a part of this compromise, the Trustee also agreed to pay to Summa the sum of Thirty Thousand and no/100 Dollars ($30,000.00) for attorney fees which were incurred by Summa during the prosecution of this case.

On July 26, 1983, a sales agreement for the purchase of the LHC was executed between the Trustee and one William W. Morris in his capacity as agent for the Landmark Hotel and Casino, Inc. (hereinafter collectively referred to as Morris). The Trustee executed the contract in his capacity as representative of the estate (including the assigned ownership interest in the LHC and Mark III), as President of Mark III Corp. and President of TZ. A review of this sales agreement finds that in addition to calling for a transfer of the LHC and the personal property associated therewith, both Mark III Corp. and TZ were selling to Morris the furnishings used by those corporations in connection with their operation of the hotel and casino. No specific price was independently established for the items of personal property sold by the two corporations.

On October 28, 1983, the Trustee executed a deed to Morris, thereby transferring his ownership interest in the LHC. He also executed to Morris, in his capacity as partner in Mark III, an assignment of the "lease" which existed between himself and Mark III Corp. Under these assignments, Morris was required to either pay the Summa arrearages which accumulated during the Trustee's possession, or to reimburse the Trustee for the payments to Summa which became due during the Trustee's possession. In effect, Morris was to be liable to the Trustee for the monthly payments to Summa which became due after the initiation of liquidation proceedings, payments which the Trustee had not made. At the time of closing, the arrearages to Summa totaled One Million One Hundred Eighty-nine Thousand Fifteen and no/100 Dollars ($1,189,015.00). It

should be noted that as a part of this sales contract, Morris assumed the outstanding mortgage obligation to Summa.

In return for the transfer of the LHC, the sale of all property related thereto, and the assignment of leases, the contract obligated Morris to pay to the Trustee the sum of Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00). Payment of this amount was to be made in several stages. Initially, the contract required a "deposit" of $100,000.00 at the time the contract was executed. Upon closing, Morris would tender Two Million Four Hundred Thousand and no/100 Dollars ($2,400,000.00). The final payment of One Million Seven Hundred Thousand and no/100 Dollars ($1,700,000.00) was to be made to the Trustee eighteen months after closing. Although it appears that the arrearages on the Summa obligation were paid at or near the time of closing, it also appears that the monies used for this payment were immediately deducted from the Two Million Four Hundred Thousand and no/100 Dollars ($2,400,000.00) received by the Trustee at closing. It should be noted that Morris executed other independent agreements with Passport and Summa which enabled him to acquire total ownership of the LHC. The total purchase price for Morris's acquisition of the LHC was approximately Twenty Million and no/100 Dollars ($20,000,000.00).

Shortly after maturity of the Trustee's One Million Seven Hundred Thousand and no/100 Dollars ($1,700,000.00) obligation from Morris, Morris filed a Chapter 11 petition with the United States Bankruptcy Court for the District of Nevada. Under a confirmed plan of reorganization, Morris is obligated to make monthly payments to the Trustee for the balance of the obligation, plus interest. Such payments were to be made in amounts which would equal a thirty year amortization of the debt. However, the monthly payments were to be made for a period of forty months, at which time the entire balance of the debt becomes due. The Trustee is apparently currently receiving the payments called for under the plan of reorganization.

In addition to the foregoing facts, it appears that the sales contract and the approved compromise agreements entailed a variety of details which were employed in facilitating the LHC sale. Besides the Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00) purchase price, it appears that the estate received certain payments for the cash on hand, inventory, accounts receivable, and outstanding markers which existed at the time of the sale. The bearing these assets had on the ultimate sum received by the estate has not been made entirely clear. It also appears that in effectuating this transaction, the Trustee established a "joint" account into which all proceeds of sale were deposited pending a resolution of the present dispute. The record further indicates that either or both TZ and Mark III Corp. may have been advanced a portion of these proceeds so as to meet obligations which were incurred during the Trustee's possession of the property.

It should be noted that although the precise amount of funds to be generated for the estate from this sale is not yet clear, it does not appear that the absence of this figure will foreclose a resolution of the present dispute. As will be more fully explained, the dispute presently before the Court centers around the interpretation of language employed in the settlement agreement relative to the basis upon which the Yelverton's 5% interest should be derived. The Yelverton's argue that this figure should be derived from the total purchase price of Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00). The Trustee argues that it should be determined from the figures set forth in the allocation report. Inasmuch as these figures serve as the basis upon which the parties assert their respective positions, the absence of a final figure will not preclude a resolution of this dispute.

Pursuant to the Yelverton's settlement agreement, the Trustee obtained an appraisal of the LHC and an allocation of the respective parties' interest in the property.

This report was accomplished by an independent appraisal firm and has been presented to this Court by the Trustee for approval. The purpose of this report was to establish the value of the interests in the LHC for each party connected with the facility. Once these values have been determined, the Trustee will be able to distribute to the parties, on a pro-rata basis, the proceeds of sale. He will also be able to determine, based upon the value of his own interest, how much should be paid to the Yelvertons.

A review of the report finds that it describes in detail the LHC and all property related thereto. Included in this description of property is the real estate, buildings, furnishings, fixtures, and other improvements. Also included were certain intangible assets, the workforce, and goodwill of the business. As reflected in the report, these assets and their respective values were:

| | |
|---|---|
| real estate | $ 8,800,000.00 |
| buildings & land improvements | $ 7,400,000.00 |
| furnishings & equipment | $ 2,785,000.00 |
| leasehold improvements | $ 365,000.00 |
| hotel name & reputation | $ 350,000.00 |
| assembled workforce | $ 300,000.00 |
| Total value | $20,000,000.00 |

Although the report lists the total value of furnishings and equipment at Two Million Seven Hundred Eighty-five Thousand and no/100 Dollars ($2,785,000.00), it also indicates that the ownership of this personal property can be traced to specific entities. As stated in the report, certain furnishings and equipment valued at Two Hundred Eighty-five Thousand and no/100 Dollars ($285,000.00) were owned by Mark III Corp. Other furnishings and equipment valued at One Million Three Hundred Fifty Thousand and no/100 Dollars ($1,350,-000.00) were owned by TZ. The remaining furnishings and equipment, valued in the report at One Million One Hundred Fifty Thousand and no/100 Dollars ($1,150,-000.00), are considered to be part of the LHC facility. As has been previously indicated, the leasehold improvements made by

the tenents during their tenancy revert to the LHC when the lease expires.

After assessing the values of the property, the report conducts an analysis of the value of the various interests in the LHC. The intent of this analysis was to approximate the value of a party's interests in light of the numerous competing rights of other entities. Included in this analysis are any ownership interests which may exist, leasehold interests, options, and other contractually created rights. The report also assesses the value of the leasehold interests, with consideration given to such factors as future income, cash flow, opportunity costs, financing alternatives, and tax consequences. Based upon the author's analysis, the report allocates to the respective entities the following values:

| | |
|---|---|
| Patrick McGraw (Trustee) | $ 1,500,000.00 |
| Passport Travel, Inc. | $ 5,175,000.00 |
| Mark III Corp. | $11,975,000.00 |
| TZ Enterprises | $ 1,350,000.00 |
| Total value | $20,000,000.00 |

Based upon this allocation of funds, the Trustee asserts that the proceeds to be paid to the Yelvertons should be computed from the amount allocated to the Trustee after all expenses and adjustments to the ultimate purchase price have been made. The amount proposed to be paid by the Trustee is Eight Thousand Five Hundred Fifty and no/100 Dollars ($8,550.00). As asserted by the Trustee, this amount constitutes 5% of the total sale price paid or to be paid to the Trustee for his interests in the LHC. It should be noted that Eight Thousand Five Hundred Fifty and no/100 Dollars ($8,550.00) is 5% of the One Hundred Seventy-one Thousand and no/100 Dollars ($171,000.00). The basis on which the Trustee computed his entitlement to be $171,000.00 is unclear.

On the other hand, the Yelvertons assert that they are entitled to receive 5% of the total purchase price to be received by the Trustee. Since the total amount to be paid was, prior to the filing of Morris's Chapter 11 Petition, Four Million Two Hundred Thousand and no/100 Dollars ($4,200,-000.00), the Yelvertons contend that they

are entitled to receive Two Hundred Ten Thousand and no/100 Dollars ($210,000.00).

## LAW

The dispute presently before the Court does not directly address any of the provisions found in either Title 11 or Title 15 of the United States Code. Rather, the dispute involves the interpretation of the terms of a settlement agreement which was entered into between the parties prior to the sale of the LHC. It also involves the determination as to the degree to which the allocation report accurately reflects the values which should be accorded to the respective parties' interests.

### I

It is well established that a compromise and settlement is a contract. *See*, 15 Ohio Jur.3d *Compromise, Accord & Release* § 3. While there is no dispute as to the existence of this settlement contract, there is a serious dispute as to the meaning of certain terms therein. The uncertainty of the contract's intent arises from the ambiguous language employed in the operative provision of the settlement agreement. In order to resolve the ultimate question presented in this case, this Court must first determine the manner in which the provisions of the agreement should be interpreted. In doing so, the Court must ascertain the intent of the parties relative to their inclusion of this provision in the contract, the purpose of the contract, the circumstances surrounding its execution, and the equities of the contested matter. *See, Wapakoneta Production Credit v. Cupp (In re Cupp)* 38 B.R. 953 (Bkrcy.N.D.Ohio 1984).

A review of the facts finds that the Trustee, during the course of the sale, was required to serve in four capacities. He had to serve as representative of the estate (including the assigned ownership interest in the LHC), as an agent of Mark III, as an agent of Mark III Corp., and as an agent of TZ. It should be recalled that as a part of this entire transaction each of these entities transferred assets to Morris. The operative provisions of the agreement provide that the Yelvertons were to receive five percent (5%) "... [o]f the net proceeds allocated and payable directly to the Trustee ...". If the Court were to interpret this clause as meaning that the Yelvertons' 5% should be computed on the basis of whatever was received by the Trustee regardless of the capacity in which he received it, then it would appear that the Yelvertons' assertion in this case would be correct. If, however, the Court were to interpret the operative provision as meaning that the amount payable to the Trustee only includes the amount received in his capacity as Trustee of the estate, then the Trustee's interpretation of the agreement would be correct. Since the intent of the parties relative to this clause is not readily apparent from the face of the agreement, the Court must review both the history of this case and the evidence presented at the hearing in order to properly ascertain what it understands the intent of the parties to have been at the time of the agreement.

During the Trustee's effort to sell the LHC, it became apparent that the Yelvertons were claiming an ownership interest of 5% in that property. This claim was based upon the fact that the Yelvertons were owners of a 5% interest in Mark III. It appears that the Yelvertons were under the belief that Mark III was the titled owner of the LHC. However, a review of the documents finds the belief that their 5% interest in Mark III vested them with 5% ownership of the LHC is defective in one respect. As has been indicated, title to the LHC appears to have never been transferred to Mark III by Wolfram and the Tickels. As a result, it never became an asset of the partnership in which the Yelvertons could claim an ownership interest. The record of title clearly shows that the LHC was deeded from Summa to Wolfram and the Tickels as co-owners, that the Tickels deeded their interest to Wolfram, that Wolfram deeded an 18.7% interest to Passport, that Wolfram deeded her interest to the Trustee, and that the Trustee and Passport deeded their interest to Morris. In

light of this chain of title, it is evident that Mark III never had any legal interest in the property. Therefore, the Yelvertons' claim for a 5% ownership interest in the LHC was, as originally asserted, defective.

Despite this apparent defect in the Yelvertons' claim, the Trustee, in an effort to avoid litigation which would jeopardize the sale, entered into the settlement agreement. The language of this agreement provided only that the Yelvertons would share 5% of whatever would be paid to the Trustee from the sale. It did not distinguish between the different entities represented by the Trustee at the time of sale.

While the foregoing facts do not necessarily or directly resolve the present dispute, it is readily apparent from the evidence that the claimed 5% ownership interest served as the basis for the settlement percentage. Since this figure represents the degree of the Yelvertons' alleged ownership interest, it is logical to conclude that the parties intended for the Yelvertons to receive 5% of whatever was paid for the transfer of title to the LHC. Stated differently, it appears that the parties intended for the Yelvertons to receive 5% of whatever would have been paid to Mark III had it been the titled owner of the LHC. As a result of the fact that the Trustee has been assigned Wolfram's interest in both the LHC and Mark III, it must be concluded that the 5% figure should be computed from the amount paid to the Trustee for his ownership interest in both the LHC and Mark III. Any amounts paid to the Trustee for property transferred by either Mark III Corp. or TZ must be considered to be property of those corporations and cannot be incorporated into the amount which is used to compute the Yelvertons' 5% compromise claim.

## II

Having determined the basis upon which the Yelvertons' payment should be made, the Court must next consider the question as to what percentage of the proceeds should be allocated to the various entities that had an interest in the LHC. A review of the allocation report finds that its analysis of the different entities' interests is based upon the property's entire appraised value of Twenty Million and no/100 Dollars ($20,000,000.00). It is also premised upon the value of a party's interest from the prospective of each party having such an interest. As a result of this analysis, the report indicates that the Trustee's interest in the LHC is One Million Five Hundred Thousand and no/100 Dollars ($1,500,-000.00).

While a pro-rata percentage of the Trustee's ownership interest could be derived from this allocation, a review of the entire report finds that the approach taken in conducting the analysis does not, for purposes of this proceeding, accurately assess the values which should be assigned to each party. As has been previously indicated, the allocation report attempts to assess the value of the different entities' interests in the LHC, taking into consideration the mortgages and leases which were then in existence. However, in doing so, the report approaches the question of value from the standpoint of the fair market value of each entities' interest. Stated differently, the report attempts to assess the value which would be paid by a *bona fide* purchaser for each entities' interest in the LHC. For example, the report indicates that Mark III Corp. has an interest of Eleven Million Nine Hundred Seventy-five Thousand and no/100 Dollars ($11,975,-000.00) in the LHC property as the result of its leasehold interest, its employment of an assembled work force, its maintenance of the business's goodwill, anticipated future receipts, and other factors which relate to the corporation's future welfare. If a person wished to purchase Mark III Corp.'s interest in the LHC, this is an approximate amount which would have to be paid to acquire that interest.

Although such valuations are useful for assessing, in part, the worth of each entity which has an interest in the LHC, it does little to portray the values which must be considered for liquidation proceedings. The sale in question did not purport to sell

either Mark III Corp. or TZ. Therefore, the value of their positions in the LHC has little relevance to the proceedings at hand. The only bearing such values have is with regard to the assignment of the Mark III Corp. lease. However, even in that regard the assignment did not convey to Morris the rights to receive the profits of Mark III Corp.'s endeavors. All that was assigned was Mark III's right to receive rental payments from Mark III Corp. The value of Mark III Corp.'s interest in the LHC has no bearing to that assignment. In light of the fact that such values were used as the basis for the report's allocation, this Court cannot regard as useful the allocation proposed by the Trustee. As a result, the Court must review the evidence to determine for itself the value of the property transferred and the entity to which the property is attribuitble.

### III

A review of the entire transaction finds that the total amount to be received by the Trustee is Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00). It also finds that Mark III Corp., TZ, and the Trustee sold numerous items of personal property to Morris. These items of personal property, regardless of the owner, were utilized in the total operation of the LHC. As has been indicated, no independent price was established for the various items of personal property. The report indicates that the total value of this personal property was Two Million Seven Hundred Eighty-five and no/100 Dollars ($2,785,000.00). The report also indicates that certain items of this property, with a value of Two Hundred Eighty-five Thousand and no/100 Dollars ($285,000.00), can be specifically identified as belonging to Mark III Corp. Other items valued at One Million Three Hundred Fifty Thousand and no/100 Dollars ($1,350,000.00) can be specifically traced to TZ. The remaining One Million One Hundred Fifty Thousand and no/100 Dollars ($1,150,000.00) worth of personal property was associated with and was the property of the LHC. Since this appraisal and determination of ownership constitutes the most

concrete evidence available as to the amounts of personal property which should be allocated to any particular entity, and since there has been no showing that this apportionment is inaccurate, it must be concluded that of the entire purchase price of Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00), Two Hundred Eighty-five Thousand and no/100 Dollars ($285,000.00) must be credited to Mark III Corp., and One Million Three Hundred Fifty Thousand and no/100 Dollars ($1,350,000.00) credited to TZ for the sale of personal property to Morris.

### IV

After the amounts attributable to the purchase of personal property from Mark III Corp. and TZ have been deducted from the total price, there remains to be distributed the sum of Two Million Five Hundred Sixty-five Thousand and no/100 Dollars ($2,565,000.00). A review of the contract of sale finds that Morris was to reimburse the Trustee for the arrearages on the Summa obligation which accrued during the Trustee's possession. In the alternative, Morris was to pay those arrearages. A review of the evidence finds that those arrearages were paid out of the initial Two Million Four Hundred Thousand and no/100 Dollars ($2,400,000.00) received at closing. Regardless of whether the arrearage payment was considered to be consideration for the assignment of the Mark III Corp. lease, or was to be included in the total purchase price, the proceeds used to pay those arrearages would be assets of either Mark III or the Trustee's assigned ownership interest in the LHC. Since it has been determined that any amounts paid to either Mark III or the Trustee's LHC interest would be included in the amount used to compute Yelvertons' 5% payment, it must be concluded that any amounts paid towards the arrearages to Summa must be considered as proceeds payable to the Trustee, regardless of the fact that they were immediately deducted from the proceeds of the sale.

A further review of the entire transaction finds that there were numerous other facets of the sale, including payments for cash on hand, progressive slot machine liability, outstanding chips, accounts receivable, and inventory. The details of these other aspects are not made clear from the record which is presently before the Court. In addition, it appears from the recently filed report of sale that the expenses of sale totalled approximately Three Hundred Seventy Thousand Eighty-five and 34/100 Dollars ($370,085.34). It further appears that a "joint" account was established by the Trustee for the purpose of holding all funds received on account of the sale until such time as the Court allocated the proceeds among the various entities. There is in the record additional evidence which suggests that Mark III Corp. and TZ may have received "advances" from this "account" so as enable them to remain in operation during the Trustee's possession.

Initially, the Court must point out that the propriety of such advances is subject to question. If, in fact, advances were made, it would constitute an extension of credit out of assets which are currently part of the Debtor's estate. However, if the Trustee were to have made advances from funds which are otherwise part of the Debtor's estate, it would appear that the Trustee has a claim against those corporations for the value of those advances. Furthermore, since the consummation of sale was not dependent upon or immediately associated with these advances, they cannot be considered, for purposes of this proceeding, as expenses of sale.

In light of the foregoing considerations, it must be concluded that a resolution of the present dispute must be based upon the amount to be received by the Trustee from the original contract price of the Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00) and any proceedings directly related thereto. While the reasons for the complexity of the transaction have not been adequately explained to the Court, it does not appear that any of these details in any way modifies the amount attributable to either Mark III or the Trustee's ownership interest. As has been explained, the parties have asserted that the amount to be paid to the Yelvertons is based on either the entire purchase price or the amount allocated to the Trustee in the report. Since the Court has, for reasons previously stated, chose not to use a majority of the information found in the report, and since the only concrete evidence as to the amount to be received by the Trustee is the total purchase price, only this amount will be used in computing the Yelvertons' entitlement. Furthermore, since it does not appear that any entities other than Mark III Corp. and TZ have an interest in the proceeds of sale, it must be concluded that the Trustee's assigned ownership interest in the LHC and in Mark III entitles him to receive, subject to the Yelverton settlement, the Two Million Five Hundred Sixty-five Thousand and no/100 Dollars ($2,565,000.00) balance of the sale's proceeds. This would include One Million One Hundred Fifty Thousand and no/100 Dollars ($1,150,000.00) for the personal property, and One Million Four Hundred Fifteen Thousand and no/100 Dollars ($1,415,-000.00) for the real property.

It should be noted that the Court, in reaching this conclusion, has considered the arguments of counsel respecting the questions of whether or not the Mark III Corp. lease had been rejected, and whether or not the arrearages to Summa should be included in the amount attributable to the Trustee. At first glance, it appears that these questions are material to a resolution of the present dispute. However, a continued analysis finds that they are not, in fact, relevant. As to the former question, it appears that regardless of whether or not the Trustee has accepted the Mark III Corp. lease, the Trustee would have a claim against Mark III Corp. for its post-petition possession of the LHC. Though the lease may have been deemed rejected by the Trustee's failure to affirmatively accept, the claim for post-petition possession remains. Inasmuch as Mark III was the lessor and was entitled to receive such payments, any payment received on account of

this claim would arise from the Trustee's assigned interest in Mark III. Since such amounts are to be included in the amounts attributable to the Trustee's interest, the failure to accept or reject is of no consequence.

As to the latter question, the Court is cognizant of the fact that the inclusion of the Summa arrearages in the purchase price effectively negated the Trustee's liability to Summa, as well as Mark III Corp.'s liability to Mark III. It is possible to characterize the Trustee's payment to Summa as an expense of the estate which was incurred as a part of the sale. However, the evidence reflects that the arrearages were immediately deducted from the proceeds initially paid by Morris at closing. As a matter of procedure, the Trustee's post-petition liability to Summa is more properly characterized as a issue of adequate protection between Summa (as a secured creditor of the estate) and the Trustee. Such matters must be addressed independent of proceedings in which the Trustee disposes of his interest in the property. The fact that the amount of Summa's post-petition claim was paid to the estate by a purchaser of the collateral does not summarily relegate the purchaser's payment as proceeds to which Summa's lien attaches. Rather, a review of the contract of sale leads to the conclusion that Morris intended only to pay the Trustee for a transfer of the Trustee's interest in the property and assume the mortgage to Summa. There is nothing in the record which reflects that Summa's lien would attach to any proceeds generated by the sale. The fact that the parties included in the contract a provision which satisfies Mark III Corp.'s arrearage lends further support to the conclusion that Summa was not, as a matter of law, immediately entitled to any of the proceeds. As a result, it must be concluded that the Trustee's payments to Summa from the proceeds received at closing should not be excluded from the amounts credited to the Trustee's assigned ownership interest in Mark III and the LHC.

### V

Having determined both the basis for the Yelverton's claim and the amounts which should be considered as payable to the Trustee, the Court must finally consider the actual amounts to be paid to each of the parties entitled to participate in the proceeds. In the absence of evidence to the contrary, it is equitable and reasonable that each party participating in a distribution of proceeds should be required to receive its pro-rata share as it has been or will be received from the purchasers. In addition, it is also equitable that all participants' shares should be made subject to the costs and expenses of sale.

Since each entity is entitled to receive only its pro-rata share of the proceeds, the Court must first determine the percentage of each entity's interest in the total purchase price of Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00). Mark III Corp., having been found to have had sold property worth Two Hundred Eighty-five Thousand and no/100 Dollars ($285,000.00), is entitled to 6.788571% of the post-expense proceeds. TZ, having sold assets worth One Million Three Hundred Fifty Thousand and no/100 Dollars ($1,350,000.00), is entitled to 32.14285% of the proceeds. The Trustee, having an interest in the remaining Two Million Five Hundred Sixty-five Thousand and no/100 Dollars ($2,565,000.00), is entitled to 61.07142% of the proceeds.

The evidence presently before the Court indicates that the costs and expenses of sale, as calculated by the Trustee, were Three Hundred Seventy Thousand Eighty-five and 34/100 Dollars ($370,085.34). However, a review of the Trustee's calculations finds that he has included as expenses the Thirty Thousand and no/100 Dollars ($30,000.00) paid to Summa for attorney fees and the One Hundred Seven Thousand and no/100 Dollars ($107,000.00) paid to Baldwin in settlement of his ownership claim. While it appears that these amounts were paid as a part of the Trustee's efforts to sell the LHC, it is clear that they cannot be considered as costs and

expenses of sale. Such amounts were paid to the respective parties pursuant to agreements voluntarily entered into by the Trustee as representative of the estate. In return for these payments, the parties agreed to forego litigation which they were otherwise entitled to bring before this Court. There is nothing which necessarily bound those agreements to the sale of the LHC, nor were those agreements required, as a matter of law, to be paid prior to any sale of the property. As a result, they cannot be considered as expenses and must be deducted from the amount listed by the Trustee. Accordingly, the expenses of sale, for purposes of this proceeding, will be considered to be Two Hundred Thirty-three Thousand Eighty-five and 34/100 Dollars ($233,085.34). After this amount is deducted from the total purchaser price of Four Million Two Hundred Thousand and no/100 Dollars ($4,200,000.00), there remains to be distributed to the parties Three Million Nine Hundred Sixty-six Thousand Nine Hundred Fourteen and 66/100 Dollars ($3,966,914.66).

After the expenses of sale are subtracted from the initial payment of Two Million Five Hundred Thousand and no/100 Dollars ($2,500,000.00) there is to be distributed from the initial payment Two Million Two Hundred Sixty-six Thousand Nine Hundred Fourteen and 66/100 Dollars ($2,266,914.66). Mark III Corp. is entitled to receive 6.78571% of that amount, or One Hundred Fifty-three Thousand Eight Hundred Twenty-six and 25/100 Dollars ($153,826.25). TZ is entitled to receive 32.14285% of that amount, or Seven Hundred Twenty-eight Thousand Six Hundred Fifty and 98/100 Dollars ($728,650.98). The Trustee is entitled to receive 61.07142% of that amount, or One Million Three Hundred Eighty-four Thousand Four Hundred Thirty-seven and 43/100 Dollars ($1,384,437.43) (inclusive of the rounded-off remainder of $0.46). Since, under the settlement agreement, the Yelvertons are entitled to 5% of whatever the Trustee receives, they would be entitled to 5% of One Million Three Hundred Eighty-four Thousand Four Hundred Thirty-seven and 43/100 Dollars ($1,384,437.43), or Sixty-nine Thousand Two Hundred Twenty-one and 87/100 Dollars ($69,221.87) from the initial payment.

As for the remaining proceeds which have been or are to be paid under the terms of Morris's Chapter 11 plan, it is evident that these proceeds are to be paid in monthly installments for a period of forty months after the date on which the plan was confirmed. At the end of forty months, the entire remaining balance is due. Regardless of whether or not Morris's plan is ever consummated, it does not appear that any of the parties sharing in the proceeds are entitled to priority under either the plan of reorganization or the contract of sale. Accordingly, all parties sharing in the proceeds will be required to receive their pro-rata payments as the proceeds are paid to the Trustee. This will include the monthly payments made under the plan of reorganization and the balloon payment due at the end of the forty month period. If Morris is unable to complete the plan, then any amount generated by the Trustee's efforts to collect on the obligation will be paid pro-rata by the respective parties as they are received by the Trustee.

In reaching these conclusions the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

It is ORDERED that the Trustee pay to Mark III Corp. the sum of One Hundred Fifty-three Thousand Eight Hundred Twenty-six and 25/100 Dollars ($153,826.25).

It is FURTHER ORDERED that the Trustee pay to TZ Enterprises Inc., the sum of Seven Hundred Twenty-eight Thousand Six Hundred Fifty and 98/100 Dollars ($728,650.98).

It is FURTHER ORDERED that the Trustee is entitled to receive, for the benefit of the estate, the sum of One Million Three Hundred Eighty-four Thousand Four Hundred Thirty-seven and 43/100 Dollars ($1,384,437.43).

It is FURTHER ORDERED that the Trustee pay to Gary and Sandy Yelverton,

pursuant to the settlement agreement, the sum of Sixty-nine Thousand Two Hundred Twenty-one and 87/100 Dollars ($69,-221.87).

It is FURTHER ORDERED that the Trustee pay to Mark III Corp. 6.788571% of whatever has been paid or is paid to the Trustee under Morris's Chapter 11 proceeding or from any other efforts which are required to collect on the underlying obligation.

It is FURTHER ORDERED that the Trustee pay to TZ Enterprises, Inc., 32.14285% of whatever has been paid or is paid to the Trustee under Morris's Chapter 11 proceeding or from any other efforts which are required to collect the underlying obligation.

It is FURTHER ORDERED that the Trustee shall receive, for the benefit of the estate 61.07142% of whatever has been paid or is paid to the Trustee under Morris's Chapter 11 proceeding or from any other efforts which are required to collect on the underlying obligation.

It is FURTHER ORDERED that the Trustee pay to Gary and Sandy Yelverton 5% of whatever amount is received by the Trustee for the benefit of the estate under the terms of this Order. However, such amounts shall not include any attorney fees which are or may be awarded to the Trustee for his participation in Morris's Chapter 11 case.

It is FURTHER ORDERED that any payments required by the foregoing orders be made within 10 days from the date of this Order or from the Trustee's receipt of funds from which payment is to be made.