**In re BELL & BECKWITH.**

**Patrick A. McGRAW, Trustee, Plaintiff,**

v.

**Gary YELVERTON, et al., Defendants.**

**No. C 88–7033.**

**Bankruptcy No. 83–0132.**

United States District Court,
N.D. Ohio, W.D.

May 26, 1988.

Philip Joelson, Toledo, Ohio, for J. Robert Jesionowski.

Edward Zoltanski, Toledo, Ohio, for Roscoe Betz, Jr.

Rene Arceneaux, Las Vegas, Nev., for Morris, Landmark Inc.

Stephen Harbeck, Washington, D.C., for SIPC.

Thomas Schank, Toledo, Ohio, for Yelverton.

Mary Ann Whipple, Fuller & Henry, Richard Wolff, Spengler, Nathanson & Heyman, Toledo, Ohio, for Patrick McGraw, Trustee.

## OPINION AND ORDER

WALINSKI, Senior District Judge.

This matter is before the Court on the appeal of Gary and Sandy Yelverton ("the Yelvertons") from the bankruptcy court's approval of a settlement between Patrick A. McGraw, Trustee for the bankruptcy estate of Bell & Beckwith ("Trustee"), and William Morris ("Morris") and his corporate designee, Landmark Hotel and Casino, Inc. ("LHC"). Also before the Court is the Trustee's brief in opposition. Jurisdiction is predicated on 28 U.S.C. § 158(a).

## FACTS

The Yelvertons are two of the more than 7,000 customers of Bell & Beckwith, a stock brokerage in Toledo, Ohio which began liquidation proceedings in February of 1983 under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. § 78aaa, *et seq.* The property in the Bell & Beckwith estate included an interest in the Landmark Hotel located in Las Vegas, Nevada.

On October 28, 1983, the Trustee and two other owners of the Landmark Hotel, Mark III Corp. and TZ Enterprises, Inc. ("Sellers"), sold their interests in the hotel to LHC and Morris. The Yelvertons also claimed an interest in the hotel and, pursuant to the bankruptcy court's order of November 20, 1986, the Yelvertons were to receive 5% of the Trustee's proceeds from the sale of the hotel. 68 B.R. 557. As consideration for the sale, LHC and Morris agreed to pay the Sellers $4,200,000; $2,500,000 at the closing and a promissory note for $1,700,000 payable on April 28, 1985. The promissory note was secured by a second deed of trust in the Landmark Hotel. Howard Hughes Realty, Inc. ("HHR") and Nevada National Bank held a prior security interest in the hotel and

Passport Travel, Inc. ("Passport Travel") held a third security position behind the Sellers.

The Sellers received $2,500,000 at the closing but LHC did not pay the promissory note when it became due on April 28, 1985. The Trustee immediately initiated foreclosure proceedings in Nevada on the Sellers' second deed of trust. On July 31, 1985, LHC filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada.

The Nevada bankruptcy court approved a plan of reorganization for LHC under which LHC was to pay the Sellers $1,700,000 on their note, plus all accrued interest through January 31, 1986. Payment on the note was to be in thirty-nine equal monthly installments plus a fortieth "balloon" payment of the entire unpaid balance. The amount of the installment payments was $18,553.52, calculated on a thirty-year amortized schedule with interest at a fixed rate of 11.25% per annum.

The monthly payments commenced on May 1, 1986 but were consistently late or not received at all. As of December 1, 1987, the Sellers had received only fourteen of the twenty payments then due, the last payment being received in August, 1987. As of November 30, 1987, the total outstanding amount owed by LHC was approximately $2,050,000.

In November of 1987, LHC and Morris offered to settle the Trustee's, as well as other creditors', claims by refinancing the Landmark Hotel with Lloyds Bank of London for $20,000,000. Because the $20,000,000 in refinancing would be insufficient to satisfy all of the secured indebtedness, the Sellers and other secured creditors were asked to take discounts on the amount of their claims. As of November 24, 1987, the various secured creditors had agreed to compromise their respective claims in the following amounts:

| Entity | Approximate Original Indebtedness | Cash Discount | Percentage of Discount |
|---|---|---|---|
| Howard Hughes Realty | $8,641,601.60 | $ 459,813.60 | 5.3 |
| Nevada National Bank | $4,434,228.80 | $ 201,180.29 | 4.5 |
| The Sellers | $2,050,000.00 | $ 375,000.00 | 18.3 |
| Passport Travel | $4,700,000.00 | $1,500,000.00 | 31.9 |
| IRS | $2,100,000.00 | $ 832,000.04 | 39.6 |

| Entity | Approximate Original Indebtedness | Cash Discount | Percentage of Discount |
|---|---|---|---|
| Clark County (Real Estate Taxes) | $ 296,730.19 | $ 25,000.00 | 8.4 |

The Sellers have already received from LHC fourteen payments of $18,553.52 on the note for a total of $259,749.28. Acceptance of the compromise amount of $1,675,000 by the Trustee would render the Bell & Beckwith estate the full $1,700,000 amount of the original note plus 5.1% interest from May 1, 1985 through November of 1987. Should the compromise and refinancing fail to go forward, HHR and Nevada National Bank have threatened to commence foreclosure proceedings.

At a hearing before the bankruptcy court on November 30, 1987, the Trustee testified that in early 1983 the real estate firm of Coldwell Banker appraised the Landmark Hotel to be worth $10,500,000. An in-house appraisal by HHR in 1983 showed the value of the hotel to be between $11,000,000 and $13,000,000. In 1985, a third appraisal indicated a value of $19,000,000, with the qualification that certain improvements be made.

The Landmark is approximately twenty years old and is located over one mile from the strip of other Las Vegas hotels and casinos. At the November 30, 1987 hearing, the Trustee testified that the hotel is "kind of a white elephant" as it is not located near the strip nor in close proximity to the Las Vegas Convention Center. (Record of November 30, 1987 Hearing at 14). The Trustee further testified that the hotel's records "reflected a continuous and heavy record of unprofitability. There may have been months here and there when the casino showed a profit, but over the long term, ... it was consistently and heavily unprofitable." (Record at 14). Should the compromise not go forward, HHR and Nevada National Bank may demolish the hotel and sell the land as raw land. (Record at 54–55).

The Yelvertons object to the bankruptcy court's approval of the proposed settlement on the grounds that the bankruptcy court "erred in approving the compromise without sufficient factual evidence to canvass the issues." (Yelvertons' Brief at 6). The Yelvertons contend that the bankruptcy court's decision should be vacated and remanded for further proceedings.

## DISCUSSION

Under Bankruptcy Rule 8013, the district court may affirm, modify, reverse or remand a bankruptcy court's decision. A district court may not set aside a bankruptcy court's findings of fact unless they are clearly erroneous. *In re Teltronics Servs., Inc.*, 762 F.2d 185 (2d Cir.1985). The bankruptcy court's conclusions of law, however, are freely reviewable on appeal. *In re Tenna Corp.*, 53 B.R. 493, 494 (Bankr.N.D. Ohio 1984), *rev'd on other grounds*, 801 F.2d 819 (6th Cir.1986).

The decision of whether to approve a trustee's proposed settlement lies within the sound discretion of the bankruptcy court and will only be disturbed or set aside if such discretion is abused. *In re Albert–Harris, Inc.*, 313 F.2d 447, 449 (6th Cir.1963). In deciding whether to approve a proposed settlement, the bankruptcy court must determine whether the settlement is in the best interest of the estate. *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D.Pa.1986). In evaluating whether a proposed settlement agreement is in the best interest of the estate, the bankruptcy court should consider:

(1) the probability of success in litigation;

(2) the difficulties, if any, to be encountered in collecting any judgments that might be rendered;

(3) the complexity of the litigation involved, as well as the expense, inconvenience and delay necessarily attendant to the litigation; and

(4) the paramount interests of creditors with proper deference to their reasonable views.

*In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir.), *cert. denied*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986).

The trustee has the burden of persuasion that the settlement is in the best interest of the estate. *In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr.D.Colo. 1986). While the court should not substitute its judgment for that of the trustee, it

must "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.' " *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir.), *cert. denied sub nom. Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)). *See also, In re Mobile Air Drilling Co.*, 53 B.R. 605, 608 (Bankr.N.D.Ohio 1985).

In considering a proposed settlement, the bankruptcy court is not resolving issues. The court is merely identifying and clarifying issues so that it can make an informed decision on the reasonableness of the settlement. *In re Carla Leather, Inc.*, 44 B.R. 457, 470 (Bankr.S.D.N.Y.1984), *aff'd*, 50 B.R. 764 (S.D.N.Y.1985).

■ In the present case, it is clear that the Trustee would have a high probability of success in litigating its claim against LHC and Morris. The litigation itself would not be complex, either, as the debt is uncontested. The bankruptcy court approved the settlement on the grounds that it would be difficult to collect any judgment rendered in favor of the Trustee, the litigation would unnecessarily increase the expenses in the Bell & Beckwith litigation, and the possibility of a more favorable recovery in the absence of the settlement would be minimal. The Yelvertons contend, however, that the bankruptcy court erred in approving the settlement because the court lacked the following key facts:

the present value of [the Trustee's] collateral position in the LHC assets, ... the present collectibility of either LHC or Morris, ... the consequences of rejecting the compromise, ... [and] the strengths or weaknesses of the collateral positions of the junior lienholders....

(Yelvertons' Brief at 4–5). The Yelvertons also assert that the Trustee failed to provide sufficient facts to substantiate the amount of the compromise.

The Yelvertons rely primarily on the case of *In re Lion Capital Group*, 49 B.R. 163 (S.D.N.Y.1985), in support of their assertion that the record below contains "gaping holes in the background of information" necessary for the bankruptcy court to properly determine if the settlement falls below the lowest level of reasonableness. (Yelvertons' Brief at 5). In *Lion Capital*, the trustee of the bankruptcy estate sought approval of a settlement of an adversary proceeding filed against the trustee and thirty-seven creditors of the debtor. The plaintiff held $45,000,000 in securities in the debtor's accounts as security for loans made to the debtor. The plaintiff had brought suit to determine the extent of its lien and security interest in the debtor's accounts. The trustee denied the validity of the plaintiff's lien and sought to equitably subordinate the plaintiff's lien pursuant to Bankruptcy Code § 510(c). The trustee also sought to recover certain transfers to the plaintiff as preferences, pursuant to Bankruptcy Code § 547.

Objections to the settlement agreement were filed by some forty-two entities. At issue was the trustee's probability of success on the merits of the pending claims and the best interests of the creditors. In *Lion Capital*, the record demonstrated that the trustee had a "high probability" of success in defeating the plaintiff's liens, based on at least three legal theories. 49 B.R. at 178. However, the trustee failed to present key information necessary for the court to determine the probability of success on the trustee's preference claim. *Id.* at 184–89.

The trustee asserted that the settlement agreement should be approved because it would fix the parties' claims, would bring in a substantial sum to the estate, and would enable the trustee to begin formulating a plan. *Id.* at 190. The trustee further asserted that, in approving settlements, the "lowest level of reasonableness standard contemplates only a limited review" by the bankruptcy court. *Id.* The bankruptcy court did not approve the settlement agreement, however, because the trustee urged approval of it based almost entirely on the trustee's opinion that it was a good settlement. The bankruptcy court stated that "[t]he best interests of creditors ... requires more than a trustee's *ipse dixit* or request for reliance on his judgment." *Id.*

In the case *sub judice*, the debt owed to the trustee is uncontested. At issue here

is the collectibility of that debt, an issue not present in *Lion Capital.* ("There is no dispute as to difficulty of collection. No evidence suggests that [the plaintiff] will not be able to respond to a judgment on the Trustee's counterclaims" *Id.* at 176).

At the hearing held by the bankruptcy court on November 30, 1987, the Trustee and others testified to the financial instability of the Landmark Hotel. The Trustee had access to the hotel's financial records for its entire twenty-year history and he testified that "[t]here may have been months here and there when the casino showed a profit, but over the long term ... it was consistently and heavily unprofitable." (Record at 14). This testimony was corroborated by the testimony of Rene Arceneaux ("Arceneaux"), counsel for Morris and LHC, that the hotel lost approximately $1,200,000 in its 1986 fiscal year and $2,700,000 in its 1987 fiscal year. (Record at 52).

While no appraisal of the hotel was presented to the bankruptcy court, the Trustee testified that an appraisal done at his request revealed a value of $10,500,000. (Record at 16). This appraisal was made by Coldwell Banker in 1984. Arceneaux testified that an in-house appraisal by HHR in 1983 indicated a value of between $11,-000,000 and $13,000,000. (Record at 54–55). The appraisal which indicated the hotel's value to be $19,000,000 was contingent on making certain improvements and also locating a buyer who could procure a Nevada gaming license.

Should the settlement not be approved, it is quite possible that the Trustee would receive nothing out of the LHC bankruptcy. The prior claims of HHR and Nevada National Bank are in excess of $13,000,000 and two of the three appraisals testified to at the November 30, 1987 hearing indicate that the hotel is worth less than that amount. It appears that the hotel is considered, by some, to no longer be a viable going concern and HHR plans on demolishing the hotel if it has to foreclose. Based on the foregoing, it is clear that the Trustee presented sufficient facts concerning the uncollectibility of any judgment it may obtain against LHC for the bankruptcy court to approve the settlement.

While the Trustee could proceed against Morris as guarantor of LHC's note, Arceneaux testified that Morris "doesn't have any money" and that he may be held personally liable for withholding taxes owed to the Internal Revenue Service if the parties do not agree to the settlement. (Record at 59–60, 69). Although Morris has an interest in seeing the settlement approved, the bankruptcy court had the ability to judge the credibility of Arceneaux's testimony. Therefore, the Trustee presented sufficient, albeit not extensive, evidence to the bankruptcy court concerning Morris' ability to fulfill his obligation as guarantor of the note. The bankruptcy court did not abuse its discretion by approving the settlement without requiring a more extensive investigation of Morris' ability to pay on the note.

The Trustee also testified as to the possible consequences of rejecting the compromise—HHR and Nevada National Bank may foreclose, the hotel may be demolished, and the Sellers may receive nothing from LHC. Furthermore, Arceneaux testified that at least one of the junior lienholders is difficult to negotiate with. The Trustee reasonably believed that the acceptance of the compromise by the junior lienholders should not be jeopardized by trying to force them into a less attractive compromise based on their status as junior lienholders. Finally, the fact that the Trustee determined $375,000 to be "a reasonable discount" and could not say why that figure is more reasonable than $350,-000 or $400,000 is of little consequence. The differences in amounts the Yelvertons raise are $25,000, a mere 1.2% of the total amount of the indebtedness here. The practice of negotiation and compromise, highly valued in our judicial system, *In re Heissinger Resources Ltd.,* 67 B.R. 378 (C.D.Ill.1986), involves a certain degree of arbitrariness. However, this does not make the Trustee's approach to the compromise "cavalier." (Yelvertons' Brief at 5).

The fact that only the Yelvertons object to the settlement is of significance. The rest of Bell & Beckwith's creditors, including the Securities Investor Protection Corporation, Bell & Beckwith's largest credi-

tor, have no objections to the compromise. This settlement will allow the Trustee to recover *all* of the principal on LHC's note, plus a small amount of interest. The bankruptcy court certainly had the best interests of the creditors in mind here as it stated at the hearing that "[t]he sooner we can get this thing concluded, the sooner we can pay the money to those people to whom it rightfully belongs." (Record at 105).

In conclusion, this Court finds that the bankruptcy court did not abuse its discretion by approving the settlement agreement. The Trustee presented sufficient evidence for the bankruptcy court to find that the settlement did not fall below the lowest level of reasonableness. The collectibility of any judgment against LHC or Morris is highly questionable and this settlement assures the estate a substantial recovery.

Accordingly, it is

ORDERED that the bankruptcy court's approval of the settlement agreement is AFFIRMED.