In re SACRED HEART HOSPITAL OF NORRISTOWN d/b/a Sacred Heart Hospital and Rehabilitation Center, Debtor.

Bankruptcy No. 94–13275DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 20, 1995.

William A. Slaughter, Philadelphia, PA, for Debtor.

Jayne C. Shinko, Assistant Counsel, Office of Chief Counsel, Commonwealth of Pennsylvania Dept. of Labor and Industry, Harrisburg, PA, for Pa. Dept. of Licenses & Inspections.

Leslie B. Gaynus, Pennsylvania Department of Revenue, Bureau of Employee Tax Operations, Philadelphia, PA, for Pa. Dept. of Licenses & Inspections.

Robert Szwajkos, Lavin Coleman Finarelli & Gray, Philadelphia, PA, Former Mediator.

Neal D. Colton, Cozen & O'Connor, Philadelphia, PA, for Creditors' Committee.

Robert Lapowsky, Stevens & Lee, Wayne, PA, for AllMed Financial Corp.

John J. Koresko, V, Koresko & Noonan, Norristown, PA, for certain former employees of Debtor.

Claudia Z. Springer, Duane, Morris & Heckscher, Philadelphia, PA, for Municipal Bonds Investors Insurance Company.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Midlantic Bank.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

### OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before the court is an objection ("the Objection") to a claim filed by the Pennsylvania Department of Labor and Industry ("L & I") which asserts a priority tax claim under 11 U.S.C. § 507(a)(7)(E) (now § 507(a)(8)(E)), against SACRED HEART HOSPITAL OF NORRISTOWN d/b/a SACRED HEART HOSPITAL AND REHABILITATION CENTER ("the Debtor") for reimbursement of a now-undisputed sum paid by L & I on account of the Debtor's unemployment com-

pensation ("UC") liability. The sole issue is whether this sum is properly characterized by L & I as an "excise tax."

Although we previously held, in this case, *In re Sacred Heart Hospital of Norristown,* 1995 WL 496005 (Bankr.E.D.Pa. August 15, 1995) ("the WC Decision"), that the Debtor's obligations to L & I for similar reimbursements on account of workmen's compensation ("WC") payments were not a tax, we find, *inter alia,* that UC liabilities in issue have consistently been designated as an "excise tax" and that the absence of a private insurer option distinguishes the UC system at issue in the instant matter from that addressed in the WC Decision. Therefore, we will overrule the Objection.

## B. FACTUAL AND PROCEDURAL BACKGROUND

On May 25, 1994, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The facts surrounding the Debtor's filing have been previously set forth in five Opinions of this court published in West's Bankruptcy Reporter at, dated, and holding, respectively: 186 B.R. 891 (Bankr.E.D.Pa.1995) (September 28, 1995) (the Borough of Norristown was permitted to belatedly file a proof of claim); 182 B.R. 413 (Bankr.E.D.Pa.1995) (the Debtor's liquidating plan was confirmed); 181 B.R. 195 (Bankr.E.D.Pa.1995) (the Debtor's lawsuit seeking certain reimbursements from Blue Cross was referred, at least initially, to arbitration); 177 B.R. 16 (Bankr.E.D.Pa. 1995) (a motion of certain former employees to file a class proof of claim and to extend the bar date as to them was denied) ("*Sacred Heart II*"); and 175 B.R. 543 (Bankr.E.D.Pa. 1994) (a home health care service provider was not allowed to assert a trust against certain of the Debtor's accounts receivable). The above-referenced Opinions, particularly *Sacred Heart II,* 177 B.R. at 18–19, chronicle the Debtor's closure on May 18, 1994, and the subsequent termination of approximately 410 full-time and 371 part-time employees of the Debtor. As might be expected, this action resulted in a substantial number of claims for UC benefits. Since the Debtor's plan was confirmed over seven months ago, the only matters that remain to be completed in administration of this case are the resolution of certain outstanding objections to claims.

On July 21, 1994, L & I filed a proof of claim in the Debtor's case ("the First Proof of Claim") asserting a priority tax claim in the amount of $7,584,610.34. Subsequently, on October 26, 1994, L & I replaced the First Proof of Claim with a second proof of claim, docketed as No. 286 ("the Claim"). The Claim sets forth its basis as reimbursement of UC payments made to former employees of the Debtor, beginning in December 1993 and projected through June 1996. The amount allegedly due to L & I under the Claim was modified slightly downward to $7,261,136.60.

The instant dispute arose as a result of the Debtor's filing of the Objection on April 11, 1995, to the Claim, asserting that (1) the amount of L & I's claim should be reduced to $2,379,519.79; and (2) except for $5,480.31, which represents unremitted pre-petition employee withholdings for the second quarter of 1994, the Claim is not a tax claim entitled to priority under 11 U.S.C. § 507(a)(8)(E).[1]

The hearing on the Objection was ultimately continued until July 12, 1995. At that time, the parties requested the appointment of a mediator to attempt to resolve this matter under this court's established mediation program. On July 13, 1995, Robert Szwajkos, Esquire ("the Mediator"), was appointed by this court per the agreement of the parties. On September 26, 1995, the Mediator indicated that he had successfully narrowed the issues and that, in the event that the matter was not completely settled by October 9, 1995, the parties would present a Stipula-

---

1. Actually, the Objection references 11 U.S.C. § 507(a)(7)(E). The Bankruptcy Reform Act of 1994, effective only as to cases filed after its October 22, 1994, enactment, which does not include this case, added a new § 507(a)(7) priority for support and alimony payments, causing the tax priority to be renumbered as 11 U.S.C. § 507(a)(8). Although the parties correctly refer to the Code section in issue as § 507(a)(7) under the Code version applicable to this case, we will utilize the new § 507(a)(8) designation to attempt to avoid confusion throughout this Opinion, although the accompanying Order will reference § 507(a)(7).

tion of Facts to serve as the record. While this anticipated state of affairs did not result in a Stipulation of Facts, and a hearing, scheduled on November 1, 1995, was necessary, the mediation was a success. Due to the efforts of the Mediator, which we deeply appreciate, the parties were able to agree to fix the Claim at $2.5 million and the hearing itself was quite brief.

At the outset of the hearing, the parties stipulated that the Debtor was a Pennsylvania employer and that, as such, it was subject to the Pennsylvania Unemployment Compensation Law, as codified at 43 P.S. §§ 751, *et seq.* ("the UC Law"). They also agreed that the Debtor was a non-profit organization pursuant to 43 P.S. §§ 904, *et seq.*, which gave it the option to submit its payments for mandatory UC benefits on the basis of benefits paid, as opposed to paying on the basis of the amount of its employees' wages.

The sole witness at the hearing, called by L & I, was Frank Jackson, Assistant Director for the Tax Accounting Division of the Bureau of Employer Tax Operation of L & I. Jackson testified that payments to the fund encompass employer contributions, which are calculated and assessed as a result of a tax rate multiplied by taxable employee wages, employee withholding or contributions, and also payments in lieu of contributions. Jackson stated that an employer receiving a federal income tax exemption as a nonprofit entity, such as the Debtor, was eligible to make payments to the UC fund based on benefits paid in its behalf in lieu of contributions based on wages. Regarding the determination of the amounts of payments due, Jackson stated that L & I issues monthly bills to nonprofits which have elected to make payments in lieu of contributions, indicating the amount of UC benefits that were paid in a previous month. He opined that the benefit of this dispensation to non-profits that anticipated few layoffs, such as a hospital, which could generally transfer employees if certain operations were reduced, was that they could usually reduce the contributions otherwise payable. Such payments in lieu of contributions were required to be made within 30 days from when the UC benefits were paid to avoid the accruing of interest. In the event of a delinquency by a nonprofit making contributions in lieu of contributions based on wages, Jackson stated that L & I had the same sanctions available to it as with a contributing employer, presumably collection procedures.

Jackson also testified as to other relevant characteristics of the UC fund, including the fact that payments made cannot be withdrawn, that employers receive no return on payments made, and that they have no entitlement to funds not paid in benefits. Moreover, Jackson stated that UC coverage to employers is mandated, *i.e.*, the fund cannot refuse coverage to any employer. He also stated that, unlike the Pennsylvania WC system, no private insurers are authorized to collect contributions or to distribute benefits. Additionally, Jackson's testimony encompassed the filing requirements of employers making payments in lieu of contributions and contribution employers. In that vein, he stated that both types of employers are required to follow the same filing requirements, which include the filing of quarterly tax returns showing the wages that were paid to each individual in the quarter and the remittance to L & I of employee withholdings.

At the close of the hearing, the court accorded both the Debtor and L & I the opportunity to simultaneously file opening briefs on December 4, 1995, and reply briefs on December 11, 1995, arguing their respective positions. The parties were granted a one-day extension on the filing of reply briefs, and filing mishaps caused us to not receive the Debtor's final submission until December 13, 1995.

## C. DISCUSSION

Due to the efforts of the Mediator and the cooperation of the parties, the sole issue remaining is whether L & I is entitled to priority status under 11 U.S.C. § 507(a)(8)(E) for its agreed Claim of $2.5 million in UC benefits paid and to be paid to former employees of the Debtor. That Code section allows a priority to

an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a

return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition; ...

This court addressed a similar issue, arising under the Pennsylvania WC laws, earlier in this case. In the WC Decision, we decided that the Debtor's liability (of a mere $2,314.00) to the state WC fund was not an "excise tax." In so ruling, we relied heavily upon our prior decision addressing a similar WC liability of a debtor in *In re Metro Transportation Co.*, 117 B.R. 143, 151–54 (Bankr.E.D.Pa.1990). For the sake of preserving continuity and consistency in our decisions, we will begin by carefully analyzing our reasoning process in *Metro Transportation*.

In *Metro Transportation*, we started by acknowledging certain well-settled principles of bankruptcy law. Prominent among them is the notion that federal law defines a "tax" for purposes of the Bankruptcy Code, *id.* at 151, citing *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 716 (4th Cir.1989); *In re Adams*, 40 B.R. 545, 546–47 (E.D.Pa.1984); and *In re Smith Jones, Inc.*, 36 B.R. 408, 410 (Bankr. D.Minn.1984). We further stated, 117 B.R. at 151, that, while " 'a state's determination of whether something is a tax is persuasive and entitled to great weight, it is not binding,' " quoting *Adams, supra*, 40 B.R. at 546, quoting in turn *New Jersey v. Anderson*, 203 U.S. 483, 491, 27 S.Ct. 137, 140, 51 L.Ed. 284 (1906). *See also In re Lorber Industries of California, Inc.*, 675 F.2d 1062 (9th Cir.1982) (followed by *Adams* in declining to hold that a sewer use fee is an "excise tax").

We noted that a decision under the predecessor federal Bankruptcy Act, *In re Lexie Mining Co.*, 1 F.2d 344, 345 (W.D.Pa.1923), while willing to characterize an obligation to the WC fund as a "tax," was unwilling to accord it a priority. *Id.* 117 B.R. at 151–52. We also noted that Pennsylvania WC law consistently utilized terms normally associated with insurance programs in describing

that program, referencing the payments as "premiums" rather than tax obligations. *Id.* at 152. We concluded that the WC payments in issue were more like contractual payments for services rendered than tax obligations, as were the water and sewer charges at issue in *Adams* and *Lorber, supra.* We distinguished the contrary result regarding WC premium payments in *New Neighborhoods, supra*, because the West Virginia WC law in issue there did not, as did the Pennsylvania law, allow employers to choose private WC insurers. *Id.* at 152–54.

As we recognized in the WC Decision arising out of this case, since our decision in *Metro Transportation*, several other courts, including appellate courts in other jurisdictions, have analyzed the issue of according priority status to WC claims by state agencies. One court, *In re Chateaugay Corp.*, 153 B.R. 632 (Bankr.S.D.N.Y.1993), in analyzing the WC law of three states, including Pennsylvania, disagreed with our analysis and concluded that the fact that WC assessments were for a public purpose rendered them excise tax obligations, irrespective of the presence of a private insurance option.

In arguing the WC Decision, L & I understandably relied heavily upon *Chateaugay*. However, in rendering the WC Decision, we were able to reference support for our decision in *Metro Transportation* from an unlikely source: *In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 340–42 (6th Cir.1993) (*"Suburban I"*). In that case, the court affirmed a decision that a debtor's liability to the Ohio WC fund was an "excise tax." However, the court, perhaps gratuitously, rejected the reasoning of *Chateaugay* and supported our reasoning in *Metro Transportation*, stating that

> [s]ome courts, ... have allowed a rather problematic criterion to sneak into their analyses; namely, that the defining feature of a tax is its "public purpose."
>
> .     .     .     .     .
>
> ... Needless to say, all money collected by the Government goes toward defraying its expenses, and is used for public purposes. The threat of the ... reasoning [utilized in *In re Lorber Industries of CA., Inc.*, 675

F.2d 1062 (9th Cir.1982); and *Chateaugay, supra*) ], then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments (footnote omitted).

*Id.* 998 F.2d at 340, 341. Thus, while concluding that the workers' compensation fund-based claims in issue *were* excise taxes because the program in issue was "centralized and universal," *id.* at 342, the *Suburban I* court opined, at *id.*, that,

> [i]f the State had an optional participation program, or allowed employers to purchase private liability insurance, it would be unfair and without statutory justification to call state-collected premiums "taxes" and put the Bureau ahead in line while leaving unpaid private insurers to languish along with the rest of the unsecured creditors.

Not surprisingly, in the brief WC Decision, we quoted these passages from *Suburban I* in stating that *Metro Transportation* was correctly decided and that the Debtor's objection to the classification of L & I's WC claim as a priority under § 507(a)(8)(E) would be sustained. We also note that the distinctions drawn in *Suburban I* were reiterated by that court in denial of priority status of Ohio's demand for reimbursement of its payment of an individual WC claim, as opposed to its demand for WC premiums in *Suburban I,* in *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 487–89 (6th Cir. 1994) ("*Suburban II*"). Finally, the reasoning and result of *Suburban II* was followed in *In re Camilli,* 182 B.R. 247, 249–51 (9th Cir. BAP 1995). *See also In re Waldo,* 186 B.R. 118 (Bankr.D.Mont.1995) (WC fund reimbursement claim allowed as an excise tax, noting that Montana law, unlike the Arizona law at issue in *Camilli,* does not provide for the option of private insurers).

Using the framework of *Metro Transportation,* as augmented by the reasoning of the foregoing subsequent analogous cases, we begin our analysis by looking at the Pennsylvania UC Law. The UC Law allows the employer to choose the *method of financing* unemployment compensation, either by contributions or payments in lieu of contributions ("reimbursement"), unless the employer fails to comply with the Act's reporting requirements 43 P.S. §§ 903(b) and (c). The provision of the UC Law allowing for election in lieu of contributions, 43 P.S. § 904, reads as follows:

> (a) any nonprofit organization which ... becomes liable to the contribution provisions of this act may, in lieu of payment of such contributions, elect to pay the department for the Unemployment Fund an amount of regular benefits and of one-half of the extended benefits paid, that is attributable to service in the employ of such nonprofit organization.

Any nonprofit organization which becomes subject to the UC Law may exercise its election under § 904 by filing with L & I a written notice of such election. 43 P.S. § 905. It is undisputed that the Debtor filed such notice with L & I on March 31, 1992.

Under the UC Law, "contributions means the money payments required to be paid into the Unemployment Compensation Fund.... The meaning includes, where appropriate in the *enforcement provisions of this act,* payments in lieu of contributions required to be paid by employers operating on a reimbursement basis...." 43 P.S. § 753(g) (emphasis added). In addition, past due payments of amounts in lieu of contributions and applicable reports are subject to the same interest and penalties that apply to past due contributions and past due reports. 43 P.S. § 906. Included in the enforcement provisions that comprise the UC Law is an automatic lien that attaches to all franchises and property of an employer for all contributions, interest, and penalties that are due and payable by an employer. 43 P.S. § 788.1(a). Thus, pursuant to the statutory treatment accorded to payments in lieu of contributions based on wages under the UC Law, we are convinced that the intent of the Pennsylvania legislature is to treat payments in lieu of contributions and contributions equally with respect to the tools available to L & I for enforcement.

With respect to any public benefits derived from the statute, the UC Law addresses this by stating that

> [e]conomic insecurity due to unemployment is a serious menace to the health,

morals, and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance.... The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act....

43 P.S. § 752. The language of the act thus evidences the intent of the Pennsylvania legislature that the moneys obtained pursuant to the UC Law are to be used to benefit the public. The legislature's intent was to alleviate the distress of the individual worker by establishing a compulsory reserve to avert the effects of involuntary unemployment. *See Commonwealth v. Sun Ray Drug Co.,* 360 Pa. 230, 233, 61 A.2d 350, 351 (1948).

Therefore, we find a significant contrast between the "insurance language" which appears in the WC law and the tax-like characterizations of the benefits referenced in the UC Law. We note that the Supreme Court of the United States, in referencing the provisions of the Federal Unemployment Tax Act, 26 U.S.C. §§ 3301–3311, with which Jackson testified that Pennsylvania's UC program was required to comply, has repeatedly referred to the employer's UC contributions as "an excise tax." *California v. Grace Brethren Church,* 457 U.S. 393, 397, 102 S.Ct. 2498, 2502, 73 L.Ed.2d 93 (1982); and *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 775 n. 3, 101 S.Ct. 2142, 2144 n. 3, 68 L.Ed.2d 612 (1981). Similar characterizations have been rendered by the Pennsylvania courts. *Sun Ray, supra,* 360 Pa. at 233–234, 61 A.2d at 351; *Department of Labor & Industry v. New Enterprise Rural Electric Co–Op, Inc.,* 352 Pa. 413, 415–16, 43 A.2d 90, 91–92 (1945); and *Fidelity–Philadelphia Trust Co. v. Hines,* 337 Pa. 48, 51, 10 A.2d 553, 555 (1940).

A review of case law that addresses the treatment of UC as priority claims under § 507(a)(8) (or its predecessor) indicates an unbroken presence of authorities holding that UC exactions are to be treated as a "tax," and, when appropriate, accorded priority status.

In contrast to a pre-Code case holding that payments owed in consideration for WC benefits were not entitled to a priority, *see Lexie Mining, supra,* we note the presence of a Third Circuit Court of Appeals decision under the predecessor Bankruptcy Act holding that UC contribution delinquencies *are* entitled to a priority as taxes. *In re Wm. Akers, Jr., Co.,* 121 F.2d 846 (3d Cir.1941). *Accord, In re Garfield Fire Clay Co.,* 46 F.Supp. 932, 933 (W.D.Pa.1942).

Several cases decided under the Code hold to the same effect. *See In re Pierce,* 935 F.2d 709, 711 (5th Cir.1991); *In re Continental Minerals Corp.,* 132 B.R. 757, 759 (Bankr. D.Nev.1991); and *In re Skjonsby Truck Line, Inc.,* 39 B.R. 971, 973–74 (Bankr. D.N.D.1984). In *Pierce,* the debtor filed a Chapter 7 petition and owed unemployment taxes. In holding that the taxes had seventh priority under the predecessor to § 507(a)(8)(E), 935 F.2d at 711, the court cited to a statement made by Rep. Don Edwards pursuant to Congress' adoption of the 1978 Bankruptcy Code, which indicated that " 'the employers share of the employment taxes on wages earned and paid before the bankruptcy petition will receive sixth priority to the extent the return as last due ... within 3 years before the filing ... or was due after the petition was filed.' " *Id.* at 713, quoting 124 CONG.REC. H.R. 11113 (daily ed. Sept. 28, 1978). In *Skjonsby,* the court accorded priority to a claim made by the Job Service of North Dakota, the manager of that state's unemployment compensation fund, stating that the agency's claim was for an "employment tax" pursuant to 507(a)(7). *Id.* 39 B.R. at 972. In its decision, the court applied the criteria referred to in *Lorber, supra. Id.* at 972–73. Furthermore, the court found that the employer "contributions benefit the general public by funding a program which works to provide a stable and productive economy throughout the state." *Id.* at 973. *Accord Continental, supra,* 132 B.R. at 758.

L & I also cites to *In re Northeastern Ohio General Hospital Association,* 126 B.R. 513 (Bankr.N.D.Ohio 1991) (cited as *"NEOGH"*); and *In re Autistic Children of Tennessee,* 49 B.R. 917 (Bankr.M.D.Tenn. 1985), as other authorities categorizing UC benefits as excise taxes. Both do reference UC charges as "taxes," 136 B.R. at 515; and 49 B.R. at 918–19, although *NEOGH* rather mysteriously nevertheless classifies the indebtednesses as general unsecured claims. 126 B.R. at 515.

It is significant to our result to observe that the conclusion that the Debtor's liability for unpaid UC contributions is an excise tax is not inconsistent with virtually any of the divergent authorities in this area of the law, nor our decisions in *Metro Transportation* and in the WC Decision in this case. As we noted at page 42 *supra,* the results reached in *Suburban I, Suburban II, Camilli,* and *Waldo* are all consistent with this result. The choice of utilization of separate, private insurers is expressly determined to be the feature that causes certain states' WC contributions to be considered as insurance premiums, not taxes. *Suburban II, supra,* 36 F.3d at 488; *Suburban I, supra,* 998 F.2d at 342; and *Camilli, supra,* 182 B.R. at 250–51. As the *Suburban I* court points out, 998 F.2d at 341–42, this result is consistent with the result in *New Neighborhoods, supra.* The WC law at issue in *New Neighborhoods* permitted employers to self-insure, 886 F.2d at 716, similar to the right of Pennsylvania nonprofits to make payments in lieu of contributions under the UC Law in issue, but did not feature an option to utilize a private insurer, as does the Pennsylvania WC law at issue in the WC Decision.

Although it may seem as if this court is splitting hairs in concluding that WC contributions are not taxes, while UC contributions are, simply because the laws are administered in slightly different fashions, we must observe that the question is a close one, and the decision must necessarily turn on a matter which may not appear to be of monumental practical importance. We note that similar distinctions are decisive in the earlier cases as well. *Compare In re Columbia Packing Co.,* 34 B.R. 403, 404 (Bankr. D.Mass.1983); and *In re Payne,* 27 B.R. 809, 815–16 (Bankr.D.Kansas 1983) (relaxed state administration found; WC payment delinquencies are not taxes), with *In re Pan American Paper Mills, Inc.,* 618 F.2d 159, 162–63 (1st Cir.1980) (significant state administration of WC program justifies characterization of payment delinquencies as taxes).

The only case inconsistent with this result is *Smith Jones, supra.* However, that decision was effectively overruled when *Suburban I* ruled to the contrary. 998 F.2d at 340. Our result here that the UC contributions in issue are taxes would obviously be followed by the courts finding excise taxes in less receptive settings in *Waldo* and *Chateaugay.*

■ We cannot give much weight to the Debtor's observations that the UC contributions in issue are not like taxes because they are intended for regulatory purposes rather than revenue-raising and the benefits and burdens of payments and benefits, respectively, are shared by only small segments of the population. The fact that the provisions in issue are not designed to raise revenue render them, if anything, *more* oriented towards governmental benefits than quasi-proprietary undertakings such as supplying water and sewer services, as were in issue in *Lorber, supra,* and *Adams, supra.* The fact that payment of UC benefits is limited to users (employers) is not a decisively negative factor in identifying that obligation as an excise tax. By definition, an "excise" tax is a tax "imposed on the performance of an act, the engaging in an occupation, on the enjoyment of a privilege." BLACK'S LAW DICTIONARY at 506 (5th ed. 1979). *See also New York v. Feiring,* 313 U.S. 283, 287–88, 61 S.Ct. 1028, 1030–31, 85 L.Ed. 1333 (1941). Thus, every "excise-tax" is by its very nature a "user fee."

## D. CONCLUSION

The Objection of the Debtor to L & I's proper characterization of its delinquency in its obligation to make contributions for the UC benefits of its former employees as an "excise tax" under the predecessor to 11 U.S.C. § 507(a)(8)(E) is overruled in the following Order.

*ORDER*

AND NOW, this 20th day of December, 1995, after a hearing of November 1, 1995, on the Debtor's Objection ("the Objection") to the Proof of Claim of the Commonwealth of Pennsylvania Department of Labor and Industry ("L & I"), Claim No. 286 ("the Claim"), and in light of the Stipulations of the parties relevant thereto and upon consideration of the parties' post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. The Objection is, for the most part, OVERRULED, except as to the amount of the Claim, which the parties stipulate to be $2,500,000.

2. L & I is allowed a priority claim, pursuant to 11 U.S.C. § 507(a)(7)(E), of $2,500,-000.