**In re PARKVIEW HOSPITAL–OSTEOPATHIC MEDICAL CENTER, Debtor.**

**Bankruptcy No. 94–32051.**

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Dec. 19, 1996.

Order Granting Motion to Compromise
Claim, May 2, 1997.

---

John J. Hunter, Toledo, OH, Chapter 11 Trustee.

Dean P. Wyman, Cleveland, OH, for U.S. Trustee.

Robert J. Sidman, Columbus, OH, for Ohio Hosp. Assoc.

John J. McHugh, III, Sylvania, OH, special counsel to debtor.

Colette Gibbons, Dorothea M. Polster, Cleveland, OH, for debtor.

Anthony J. DeGirolamo, Mary K. Whitmer, Akron, OH, for Unsecured Creditors' Committee.

Kenneth C. Baker, Toledo, OH, for Fifth Third Bank.

Mary Ann Whipple, Toledo, OH, for Mid-Am Bank.

Edwin G. Emerson, Toledo, OH, for St. Vincents Medical Center.

Sharon S. Speyer, Toledo, OH.

Kerry Bruce, Toledo, OH, for Toledo Dept. of Utilities.

G. Christopher Meyer, Lynn M. Rowe, Squire, Sanders & Dempsey, Cleveland, OH.

Kohner, Mann & Kailas, SC, Milwaukee, WI.

David Irmscher, Fort Wayne, IN, for Wigest Corp.

John J. Keightley, James L. Beller, Washington, D.C., for Pension Benefit Guaranty Corp.

Gregory S. Severance, Asst. Ohio Atty. Gen., Revenue Recovery Section, Columbus, OH.

### MEMORANDUM OPINION
### AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court upon Motion of the Chapter 11 Trustee, John J. Hunter, For Authority to Compromise Claim of Ohio Hospital Association (hereafter "OHA"). An Objection to the Motion to Compromise was filed by the Unsecured Creditor's Committee counsel, and a Hearing was held. At the Hearing, the Court provided the parties an opportunity to file briefs addressing arguments that may have been raised at the Hearing. The briefs were filed, and the matter became decisional. This Court has reviewed the arguments of counsel, exhibits as well as the entire record in the case. Based upon that review, and for the following reasons, the Court finds that a Continued Hearing should be set on the Trustee's Motion to Compromise for the presentation of additional arguments and evidence in accordance with this Opinion.

### FACTS

On August 19, 1994, the present Debtor-in–Possession, Parkview Hospital Osteopathic Medical Center (hereafter "Parkview"), filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code. Parkview is an Ohio not-for-profit corporation. Parkview had ceased operations just before filing bankruptcy, but still retained a significant number of its employees. The labor force was substantially reduced some two weeks later, leaving only a small skeleton staff. On May 16, 1995, John J. Hunter, Sr. was appointed Chapter 11 Trustee for Parkview.

On January 9, 1995, the Ohio Hospital Association (hereafter "OHA") filed a Motion to Determine Administrative Priority of its unsecured claim. OHA is a voluntary association of various not-for-profit hospitals in the state of Ohio, and acts as a group representative for those hospitals which are members that participate in the OHA unemployment compensation program. The OHA's claim arises out of Parkview's obligation to provide unemployment benefits to its employees per Ohio Revised Code (hereafter "O.R.C.") § 4141.01 et seq. In 1971, Parkview and OHA entered into a contract whereby OHA would act as a conduit for the payment of Parkview's obligation to provide unemployment benefits for its employees as administered by the Ohio Bureau of Employment Services (hereafter "OBES").

As a non-profit organization, Parkview could elect to pay for unemployment benefits administered by the OBES in one of two ways, either through contributions on a percentage basis, or by reimbursement of actual claims paid. O.R.C. § 4141.241. Under the reimbursement option, OBES bills the employer the amount of actual claims paid out of the unemployment compensation fund. The employee's right to receive benefits is determined by the length of employment and wages regardless of the payment option the employer chooses. Ohio law provides that a group of non-profit hospitals may file a joint application to establish a group account with OBES "for the purpose of sharing the cost of benefits paid that are attributable to service in the employ of those employers," and provide for a group representative to act as the group's agent. O.R.C. § 4141.241(D)(1). Another advantage of forming such an association appears to be that the individual members do not have to provide for individual bonds to secure their OBES payments, but can associate and pay for a single bond to cover them all. See § 4141.241(C). In this case, OHA was the group representative authorized to act as an agent for Parkview and other nonprofit hospitals. The contract between OHA and Parkview called for Parkview to pay to OHA the amount due for its unemployment compensation claims, and then OHA would in turn pay OBES.

Under this system, if OHA does not make the necessary payment to OBES, OBES will bill each of the individual members a portion of the total amount of claims paid. That portion is equal to the individual member's total wages divided by the total combined wages for all the individual members. O.R.C. § 4141.241(D)(3). OBES could also call upon the bond for collection if the full amount is not recovered. O.R.C. § 4141.241(C)(2)(b). The OHA can be dissolved in the event payment is not received

for any of the member nonprofit hospitals. Ohio Administrative Code § 4141–37–11(E).

Rather than proceeding through these procedures when Parkview filed bankruptcy and ceased to pay its payments in lieu of contributions, OHA has reimbursed OBES for the unemployment compensation claims as they have come due for the employees of Parkview who lost their positions as a result of Parkview's termination of operations. The record does not reflect the source of the funds used to pay OBES, but OHA has stipulated that "all funds paid by OHA were funds of OHA." This Court can only assume that this means funds contributed from the individual members of OHA.

The parties provided stipulations wherein they agree that the total amount paid by OHA to OBES as reimbursement for unemployment compensation claims of former Parkview employees paid by OBES is presently Eight Hundred Forty-two Thousand One Hundred Ninety-two and 53/100 Dollars ($842,192.53), of which Two Hundred Twenty-nine Thousand Six Hundred Fifty and 34/100 Dollars ($229,650.34) relates to employees terminated prior to the Chapter 11 petition date, and of which Six Hundred Twelve Thousand Five Hundred Forty-two and 19/100 Dollars ($612,542.19) relates to employees terminated after the petition date. Most of this latter figure, however, relates to employees terminated only about two weeks after the petition was filed. There remains a potential liability in the amount of Twenty-nine Thousand Two Hundred Seventy-two and 09/100 Dollars ($29,272.09) for which OHA will be responsible.

After OHA filed a Motion to Determine Administrative Priority of its unsecured claim, objections were filed by the Debtor-in-Possession, Mid–American National Bank (hereafter "Mid–American"), the Unsecured Creditor's Committee, and later the Chapter 11 Trustee. The Trustee now brings the present Motion to Compromise with OHA. Under the terms of the settlement, OHA would receive a Two Hundred Thousand Dollars ($200,000) administrative expense priority claim, and a Six Hundred and Fifty Thousand Dollar ($650,000) general unsecured claim. At the Hearing, the Trustee asserted

that in the event this compromise is approved, he estimates that unsecured creditors will receive a twenty-five percent (25%) distribution. Mid–American, the largest unsecured creditor in this case, favors the settlement. Other unsecured creditors, represented by the Unsecured Creditor Committee counsel, have raised the present Objection to the Motion to Compromise.

## LAW

As the filing of this case predates the effective date of the Bankruptcy Reform Act of 1994, the Code sections quoted below represent the pertinent sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as it existed before the 1994 Bankruptcy Reform Act changes:

**11 U.S.C. § 503. Allowance of administrative expenses**

(a) An entity may file a request for payment of administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) if this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;

(B) any tax—

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title; or

(ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case; and

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph[.]

**11 U.S.C. § 507. Priorities**

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under § 503(b) of this title, and any fees and charges assessed against

the estate under chapter 123 of title 28 [28 U.S.C. §§ 1911 et seq.].

(7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(E) An excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition;

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition[.]

(d) An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection (a)(3), (a)(4), (a)(5)[ (6) ], or (a)(6)[ (7) ] of this section is not subrogated to the right of the holder of such claim to priority under such subsection.[1]

The Bankruptcy Rules provide in pertinent part:

**Rule 9019. Compromise and Arbitration**

**(a) COMPROMISE.** On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

The Ohio Revised Code provides in pertinent part:

**4141.241 Public and nonprofit employer reimbursement accounts; surety bond required; penalty for failure to make reimbursement payments**

(D)(1) Two or more nonprofit organizations that have become liable for payments in lieu of contributions, in accordance with division (A) of this section, may file a joint application to the administrator for the establishment of the group account for the purpose of sharing the cost of benefits paid that are attributable to service in the employ of those employers. Notwithstanding division (E) of section 4141.242 of the Revised Code, hospitals operated by this state or a political subdivision may participate in a group account with non-profit organizations under the procedures set forth in this section. Each application shall identify and authorize a group representative to act as the group's agent for the purposes of this division.

(2) Upon his approval of the application, the administrator shall establish a group account for the employers effective as of the beginning of the calender quarter in which he receives the application and shall notify the group's representative of the effective date of the account. The account shall remain in effect for not less than two years and thereafter until terminated by the administrator or upon application of the group.

(3) Upon establishment of the account, each member of the group shall be liable, in the event that the group representative fails to pay any bill issued to it pursuant to division (B) of this section, for payments in lieu of contributions with respect to each calender quarter in the amount that bears the same ratio to the total benefits paid in the quarter that are attributable to service performed in the employ of all members of the group as the total wages paid for service in employment by the member in the quarter bear to the total wages paid during the quarter for services performed in the employ of all members of the group.

## DISCUSSION

Determinations concerning the administration of the bankruptcy estate, the allowance or disallowance of claims against the estate, and other proceedings affecting the liquidation of the assets of the estate are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

This proposed settlement comes before the Court pursuant to Bankruptcy Rule 9019(a).

---

1. The 1984 amendments should have changed the reference from § 506(a)(6) to § 507(a)(7). The courts have uniformly made this correction.

See Norton Bankruptcy Law and Practice 2d § 42:46 (1994), *In re Chateaugay Corp.*, 89 F.3d 942, 952–54 (2nd Cir. 1996).

The Sixth Circuit Court of Appeals has explained the Bankruptcy Court's role in settlements as follows:

> In bankruptcy proceedings, as distinguished from ordinary civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable. *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re A & C Properties,* 784 F.2d 1377, 1381 (9th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). In considering a proposed compromise, the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. *In re American Reserve Corp.,* 841 F.2d 159, 162–63 (7th Cir. 1987). The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is "reasonable." *Id.* at 162.

> The need for this safeguard is obvious. Any settlement between the debtor and one of his individual creditors necessarily affects the rights of other creditors by reducing the assets of the estate available to satisfy other creditor's claims.

*Reynolds v. C.I.R.,* 861 F.2d 469, 473 (6th Cir.1988).

The District Court for the Northern District of Ohio has also had the opportunity to explain the dynamic of the bankruptcy court's decision as to whether to accept a compromise:

> The decision of whether to approve a trustee's proposed settlement lies within the sound discretion of the bankruptcy court and will only be disturbed or set aside if such discretion is abused. *In re Albert–Harris, Inc.,* 313 F.2d 447, 449 (6th Cir.1963). In deciding whether to approve a proposed settlement, the bankruptcy court must determine whether the settlement is in the best interest of the estate. *In re Neshaminy Office Bldg. Assoc.,* 62 B.R. 798, 803 (E.D.Pa.1986). In evaluating whether a proposed settlement agreement is in the best interest of the estate, the bankruptcy court should consider:

> (1) the probability of success in litigation;

> (2) the difficulties, if any, to be encountered in collecting any judgments that might be rendered;

> (3) the complexity of the litigation involved, as well as the expense, inconvenience and delay necessarily attendant to the litigation; and

> (4) the paramount interests of creditors with proper deference to their reasonable views.

*In re A & C Properties,* 784 F.2d 1377, 1381 (9th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986).

> The trustee has the burden of persuasion that the settlement is in the best interest of the estate. *In re Hermitage Inn, Inc.,* 66 B.R. 71, 72 (Bankr.D.Colo. 1986). While the court should not substitute its judgement for that of the trustee, it must "canvas the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *In re W. T. Grant & Co.,* 699 F.2d 599, 608 (2d Cir.) *cert. denied sub nom., Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (*quoting Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)). *See also, In re Mobile Air Drilling Co.,* 53 B.R. 605, 608 (Bankr.N.D.Ohio 1985).

> In considering a proposed settlement, the bankruptcy court is not resolving issues. The court is merely identifying and clarifying issues so that it can make an informed decision on the reasonableness of the settlement. *In re Carla Leather, Inc.,* 44 B.R. 457, 470 (Bankr.S.D.N.Y.1984), *aff'd,* 50 B.R. 764 (S.D.N.Y.1985).

*In re Bell & Beckwith,* 87 B.R. 476, 478–79 (N.D.Ohio 1988). See also *In re Bell & Beckwith,* 93 B.R. 569 (Bankr.N.D.Ohio 1988).

This Court will address each of the factors listed by the District Court. Before beginning it should be noted that the potential

litigation in this case is primarily legal and not factual. There appears to be no dispute as to the amount of funds paid by OHA on behalf of Parkview, and the termination dates of the employees is readily determinable. Further, even the dates of the individual employees' employment could be obtained and would not likely be a subject of factual dispute. What is at issue is the nature of OHA's claim in bankruptcy. That is, whether OHA's claim is entitled to priority or non-priority status. Regarding priorities in settlement:

> Claims with different priorities will have different settlement values. For example, administrative expenses have priority over general, unsecured claims; therefore, all else being equal, an administrative expense claim will have a higher settlement value than a general unsecured claim.

*In re American Reserve Corp.*, 841 F.2d 159, 162 (7th Cir.1987). However, this Court must also be mindful of the admonition that, "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). As stated by the Sixth Circuit Court of Appeals, "Priority claims must be carefully limited since every such claim reduces the fund available to general creditors. For this reason creditors must tie their priority claims to specific provisions of the Bankruptcy Code." *In re Suburban Motor Freight (Suburban II)*, 36 F.3d 484, 487 (6th Cir. 1994).

Indeed, it is the very fact that OHA has such a potentially large priority claim which persuades the Trustee to settle this case. It appears to this Court that none of the parties, with the possible exception of OHA itself, are certain that OHA could prevail if the legal issue were litigated. However, the stakes are high. As the Trustee rightly asserts, there is at least a minimal possibility that OHA could prevail, rendering the entire amount of its sizable claim an administrative priority claim. Because of the size of OHA's claim, this could have a significant impact what is left for the general unsecured creditors.

The Trustee makes the following deduction. As noted above, under the terms of the settlement OHA would receive a Two Hundred Thousand Dollars ($200,000.00) administrative expense priority claim, and a Six Hundred and Fifty Thousand Dollar ($650,000) general unsecured claim. Assuming a twenty-five percent distribution to unsecured creditors, this would yield approximately Three Hundred and Sixty-two Thousand Dollars ($362,000) to OHA from the Parkview estate. Compare this to a Two Hundred Twelve Thousand Dollars ($212,000) distribution of twenty-five percent if OHA's total claim (of approximately Eight Hundred Fifty Thousand ($850,000)) was litigated and found to be non-priority; the difference between these two possible distributions can be seen to be approximately One Hundred and Fifty Thousand Dollars ($150,000). The Trustee asserts that this amount is a reasonable price for resolving the risks involved in litigating OHA's claim. This formula does not account, however, for the increase in the distribution to unsecured creditors in the event that OHA does not prevail (the funds available for unsecured creditors would increase, but the total claims would also increase, so the amount of change would be based upon the relative amounts of the estate and total claims). This Court nevertheless finds the formula helpful, though not conclusive.

Of the factors prescribed by the United States District Court in *Bell & Beckwith* to analyze a motion to compromise, the first factor, the probability of success in litigation, is the most dispositive in this case. However, the other factors are more easily analyzed, and will be addressed first.

Concerning the second factor, collectibility of any judgment obtained, there is no problem. This is because it is not the estate which is trying to collect on a claim, but rather a creditor is asserting a claim against the estate. Thus, this factor weighs against the settlement.

Concerning the third factor, the complexity of the litigation including the expense, inconvenience, and delay necessarily attendant to the litigation, this Court has explained:

> Obviously the term "complex" is a relative term that moves along a sliding scale.

However, the volume and detail of the evidence required to prove the Trustee's constructive trust theories, and the practical problems associated with making a presentation of these facts interesting to a jury, lead the Court to conclude that this factor weights in favor of settlement.

*Bell and Beckwith*, 93 B.R. at 575. The Trustee, OHA, and Mid–American appear to assert that the issues are very complex. However, as noted above, the issues in this case are primarily legal and not factual. Thus, there is little in the way of extensive discovery or presentation of evidence that would be necessary to litigate this issue. Further, the parties have already prepared and filed extensive briefs on the legal issues involved in this case. Thus, the legal theorizing is largely completed. The primary concern of the parties appears to be the delay that could be the result of successive appeals. Though this concern of delay may be real, this Court does not believe that it alone is worthy of the size of the settlement at issue in this case if the probability of loss on the merits is minute.

Another factor to be considered in the analyzing a motion to compromise is the "paramount interests of creditors with proper deference to their reasonable views." However, the interests of the creditors in this case appear to diverge. As noted supra, Mid–American is the largest unsecured creditor, and favors the compromise. Other unsecured creditors, whose interests are represented herein by the counsel for the Unsecured Creditor's Committee, do not favor the compromise. The difference does not appear to turn so much on differing views the legal issues involved, but rather on different weight given to the delay and cost of potential appeals in relation to the risks and benefits of litigation. Regardless of the reason for this difference, this Court does not find this factor particularly probative in this case. Again, the most determinative issue appears to be the probability of success in litigation, to which this Court will now turn.

■ The District Court in *Bell and Beckwith*, cited above, explained that the Bankruptcy Court should not substitute its judgment for that of the trustee, but should "canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." 87 B.R. at 478–79. It also explained that the trustee has the burden of persuasion that the settlement is in the best interest of the estate. *Id.* Therefore, to determine the probability of success of OHA's priority claim, this Court will examine whether the Trustee has proffered any reasonable legal theory to support the OHA claim on any of the possible legal bases that could support it. This Court will not go so far as to consider whether the claim would ultimately prevail, but only whether it has sufficient weight to make the compromise reasonable.

■ This Court finds three possible legal bases for OHA to claim priority status. First, as an administrative expense as an actual, necessary cost of preserving the bankruptcy estate per § 507(a)(1) in conjunction with § 503(b)(1)(A). Second, as a claim entitled to priority treatment as a tax per § 507(a)(8). Finally, as a post-petition tax claim accorded administrative expense priority per § 507(a)(1) and § 503(b)(1)(B). Again, because the Trustee bears the burden of showing that his Motion to Compromise is reasonable, this Court will only consider whether the Trustee has offered any legal authority which a court could reasonably follow. This Court will consider the arguments put forth by OHA in its motions and memoranda as well, as they are part of the record.

■ First, this Court will consider whether there is a reasonable legal basis for OHA's claim as an administrative expense per § 507(a)(1) and § 503(a)(1)(A) which could support the present compromise. Section 507(a)(1) gives administrative expenses first priority status, meaning that these expenses get paid before any other expenses are paid in the order of distribution. Section 503(b) defines what constitutes administrative expenses. Subsection 503(b)(1)(A) provides that "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case" are administrative expense claims. The logic behind this provision is clear. If post-petition creditors are not guaranteed

payment from the bankruptcy estate, they will simply not provide their services, and the debtor's estate could lose value as a result. *In re United Trucking Service, Inc.*, 851 F.2d 159, 161 (6th Cir.1988).

Neither the Trustee or OHA has put forth any case law or any reasonable legal argument as to how the payment to OBES by OHA helped to preserve the bankruptcy estate. OHA has cited cases finding that severance pay claims can sometimes receive administrative priority, but such cases are inapplicable to the present matter. OHA cites *In re Mariner Enterprises of Pensacola, Inc.*, 173 B.R. 771 (Bankr.N.D.Fla.1994); *In re Wean Inc.*, 171 B.R. 528 (Bankr. W.D.Pa.1994); and *In re Allegheny Intern., Inc.*, 118 B.R. 276 (Bankr.W.D.Pa.1990). Those cases dealt with employees' severance pay, where the employees would receive payment directly from the debtor. Thus, in those cases the payment could be considered to be earned post-petition, or as an incentive to encourage the employees to continue working for the benefit of the debtor estate. In this case it is undisputed that OBES would provide unemployment benefits to the employees regardless of whether OHA paid them. Further, the reasoning in the cases cited by OHA has not been adopted in this jurisdiction. In *In re Ohio Corrugating Co.*, 115 B.R. 572 (Bankr. N.D.Ohio 1990), the Court followed the clear majority of courts that severance pay is not entitled to priority status simply because the right to payment arises because of debtor's post-petition action, but that an employee earns the right to severance pay and vacation pay as the employment relationship progresses. *Id.* at 578–79. *Ohio Corrugat-*

*ing* is in line with the Sixth Circuit precedent on the issue of administrative claims, *In re White Motor Corp.*, 831 F.2d 106 (6th Cir.1987) (which followed *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976), cited by the Court in *Ohio Corrugating*.) Thus, OHA's claim does not warrant the sizable settlement at issue in this case based on the alleged benefit to the estate.[2]

■ The second potential legal basis for which the claim of OHA could be entitled to priority treatment, so as to support the present motion to compromise, is that it receive priority as a tax claim under § 507(a)(7). (This section is now § 507(a)(8) after the changes made to the Code by the Bankruptcy Reform Act of 1994.) However, OHA is an association of private non-profit hospitals, and not a taxing governmental unit. Thus, for OHA's claim to enjoy tax priority status, it must be held to be subrogated to the rights of OBES, which is a governmental unit. However, the Code provides in § 507(d) that the holder of a claim subrogated to the rights of a § 507(a)(7) tax claim is not subrogated to priority rights under that section. See *In re Northeastern Ohio General Hosp. Assoc.*, 126 B.R. 513, (Bankr.N.D.Ohio 1991), discussed infra, which allowed OHA to be subrogated to the claim of OBES, but not to OBES's tax priority. *Id.* at 515–16. Thus, even if claims arising from the payment of unemployment benefits are "taxes" per § 507(a)(7), they are not entitled to § 507(a)(7) priority status. Therefore there is no legal basis for the reasonableness of the compromise under § 507(a)(7).

■ The final possible legal basis for which OHA's claim could be entitled to prior-

---

2. The Court will note that the Trustee did mention one possible benefit to the estate. That is, if OHA had not paid OBES, OBES could charge Parkview fourteen percent (14%) on its claim per O.R.C. § 4141.23. This could be a significant amount considering the size of the claim. However, this Court believes that the prevention of such interest accrual was for the benefit of OHA primarily, and falls into the rule established in *Wolf Creek Collieries Co.*, 127 B.R. 374 (N.D.Ohio 1991) (Court held that creditor does not have an administrative expense claim when it incurred the expenses primarily with its own self interest in mind.) Further, considering the relative amounts, it is a curious notion that OHA's entire

claim should be an administrative expense because it prevented interest on the principal of its claim in the event the claim was asserted by another creditor. This is especially true considering that the claim OBES would assert against Parkview could be substantially less, even with interest. Under O.R.C. § 4141.241(D)(3), in the event the group representative, OHA in this case, fails to make payment to OBES as billed, OBES will bill the individual hospitals in portions of the unpaid bill equal to the individual member's total wages divided by the total combined wages for all the individual members. The Trustee has not shown what this portion would be. (This is discussed in more detail infra.)

ity treatment so as to support the present motion to compromise is that it receive administrative expense priority as a post-petition tax under § 503(b)(1)(B). As explained supra, to be paid as a tax claim, OHA must be subrogated to the rights of OBES. Although under § 507(d) OHA could not be allowed subrogated priority rights for taxes which gain priority status under § 507(a)(7), the plain language of § 507(d) does not appear to prohibit the subrogation of priority rights from taxes which gain priority as a post-petition administrative expense tax against the debtor-in-possession under § 503(b)(1)(B). This leads to two issues, whether the claim of OHA, or rather the potential claim of OBES, is a "tax" per § 503(b)(1)(B), and if so, whether is it a post-petition tax.

The parties have thoroughly argued in briefs whether unemployment compensation would be considered a tax under the Sixth Circuit's *Suburban* cases, *In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 340–42 (6th Cir.1993) (*"Suburban II"*),[3] and *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 487–89 (6th Cir.1994) (*"Suburban III"*). For purposes of approval or disapproval of the compromise in this case, this Court finds it unnecessary to consider these arguments in great detail. The Trustee has cited one case that has determined that a state's unemployment compensation scheme is a tax, *In re Sacred Heart Hosp. of Norristown*, 190 B.R. 38 (Bankr.E.D.Pa.1995). Though it is the only case the Trustee has cited for this proposition, this Court finds it sufficient authority to support the proposition that unemployment compensation could be characterized as a tax, at least for purposes of the present Motion to Compromise. Further, though the holding in *Sacred Heart* concerned the Pennsylvania unemployment compensation scheme (rather than that of Ohio at issue in this case), the Court actually explained the Sixth Circuit's *Suburban* cases. *Id.* at 41–42, 44.[4]

Having found that it is not patently unreasonable that a Court could find that OHA's claim could be a tax, the next question is whether it could be a post-petition tax. The Trustee cites *In re Northeastern Ohio General Hosp. Assoc.*, 126 B.R. 513 (Bankr. N.D.Ohio 1991), mentioned supra. *Northeastern Ohio* came from the Eastern Division of the same district in which this Court sits, and dealt with similar issues. OHA was also a creditor in *Northeastern Ohio*, and was similarly asserting that the unemployment compensation payments should accorded priority status. In that case OHA asserted that OBES charges corresponding to payments made to former employees before the petition date were non-priority claims, while charges for payments made after the petition date were administrative expenses and therefore priority claims. *Id.* at 515. The specific issue was whether the OBES charges for post-petition payments were taxes "incurred

---

3. The Supreme Court has recently addressed the issue of the determination of excise taxes under § .507(a)(7), in *United Sates v. Reorganized CF & I Fabricators, Inc.*, —— U.S. ——, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). Though the Supreme Court's holding was more specifically addressed to distinguishing tax penalties from excise taxes, when making this determination, the Court looked beyond the assessment's label to the operation of the provision. —— U.S. at ——–——, 116 S.Ct. at 2111–14. Thus, the Supreme Court's holding would appear to support the type of analysis found in the Sixth Circuit's *Suburban* cases.

4. It should also be noted that in *Suburban II*, the Court found that the unpaid workers compensation self-insured payments were not a tax because according priority treatment to the government's claim would disadvantage private creditors with like claims. 36 F.3d at 489. The private creditors so disadvantaged were the bond sureties which had already paid portions of the claim and who would not receive administrative priority. *Id.* The Court did not explain why these sureties would not be similarly situated, but upon closer inspection it appears that the sureties would not receive administrative priority because § 507(d) would prohibit subrogation, because the claim at issue in that case arose pre-petition. The *Suburban II* Court did not have occasion to address the issue of post-petition claims, in which case the government and the sureties could have argued that they were similarly situated because the sureties could be subrogated to the rights of the governmental on the claims they paid. However, the outcome of such an argument is less than certain, and this Court concludes that the Trustee has shown that it is not beyond the lowest level of reasonableness that OHA's claim could subrogated to OBES's tax priority, at least to the extent it is a post-petition tax.

by the estate." *Id.* It was undisputed by the parties that the entire amount was a tax obligation within the meaning of the Bankruptcy Code. *Id.*[5]

Thus, like the case at bar, the issue in *Northeastern Ohio* was whether OHA's subrogated claim for reimbursement of unemployment compensation payments made to employees after the petition date was a post-petition claim. There was one significant difference, however. Unlike the case at bar where the majority of employees were actually terminated two weeks after the petition date, in *Northeastern Ohio* the employees were all terminated pre-petition. The Court explained and held:

> For purposes of administrative expense allowance, a tax claim is incurred on the date it accrues rather than the date it is assessed or becomes payable. *In re Overly–Hautz Co.,* 57 B.R. 932 (Bankr.N.D.Ohio 1986) *aff'd on other grounds,* 81 B.R. 434 (1987). Accord *In re Wheeling–Pittsburgh Steel Corp.,* 103 B.R. 672 (W.D.Pa.1989), *In re Scrap Disposal, Inc.,* 24 B.R. 178 (Bankr.S.D.Cal.1982) *aff'd,* 38 B.R. 765 (9th Cir. BAP 1984).
>
> Chapter 4141 of the Ohio Revised Code establishes the policy and laws of the State regarding unemployment compensation. Ohio Rev.Code § 4141.01 et seq. Pursuant to its provisions employers are required to fund the cost of providing unemployment benefits to their former employees. See Ohio Rev.Code §§ 4141.09, 4141.24, 4141.25, 4141.28. The right to unemployment compensation for eligible individuals arises upon involuntary total or partial employment. Ohio Rev.Code § 4141.29. Benefits payable are based on an employee's average weekly wage. No benefits are paid except upon application. Ohio Rev.Code § 4141.29. Employers are required to make periodic contributions to the state unemployment compensation fund by Section 4141.25. A non-profit organization may, however, elect to make payments in lieu of contributions. Ohio Revised Code § 4141.241. Debtor opted

for payments. As a reimbursing employer, pursuant to Section 4141.241, it was required to make periodic payments equal to 'the full amount of regular benefits paid plus one half of the amount extended benefits paid' during such period attributable to service in it employ. Ohio Rev.Code § 4141.241(B). OHA argues the unemployment compensation charges of a reimbursing employer are measured on the basis of actual payment of benefits. The payments which triggered liability occurred post-petition, therefore, OHA alleges the charges were incurred by the estate. Trustee states the tax accrued on the date the employees were terminated and the charges were, therefore, incurred pre-petition.

> On consideration the OHA claim is not entitled to administrative expense status. Events upon which the tax is based occurred entirely pre-petition. The employees and Debtor's business operations were terminated prior to the Chapter 11 filing. Moreover, Debtor had no post-petition business operations. Pursuant to Ohio statute, the tax liability accrued predicated on these pre-petition events. The mere fact the amount of tax due could not be determined or the amounts were not payable until post-petition does not elevate the charges to priority status. These charges were clearly not incurred by the estate as mandated by Section 503(b)(1)(B)(i).

*Northeastern Ohio,* 126 B.R. at 515.

From the foregoing it is not patently unreasonable for purposes of the compromise at issue here that *Northeastern Ohio* could stand for the proposition that claims for reimbursement of unemployment compensation payments, if found to be a tax, would be incurred on the date the employees were terminated. That is, if OBES's claim is found to be a tax claim, it could be considered to be incurred on the date it is assessed, and this date could be the date of the employee's termination.

In the case at bar, of OHA's total claim thus far is Eight Hundred Forty-two Thou-

---

**5.** This is a significant difference from the case at bar, where the other parties strongly contend that OHA's claim is not a tax. This is explained

at least in part, no doubt, by the fact that the Sixth Circuit's *Suburban* cases came out after *Northeastern Ohio.*

sand One Hundred Ninety-two and 53/100 Dollars ($842,192.53), of which Six Hundred Twelve Thousand Five Hundred Forty-two and 19/100 ($612,542.19) was the result of claims made by employees terminated post-petition. Thus, the reasonably probable downside risk of litigation over settlement would appear to be that approximately Six Hundred Twelve Thousand Dollars ($612,000) would be found to be an administrative claim. Assuming for the sake of simplicity that this would not change the percent distribution to unsecured creditors, OHA would also receive twenty-five percent of the pre-petition portion of its claim (that being approximately Two Hundred Thirty Thousand Dollars ($230,000)), which would be Fifty-eight Thousand Dollars ($58,000). Thus, the total amount OHA could receive from the estate would be, very approximately, Six Hundred Seventy Thousand Dollars ($670,000) if it prevailed in litigating its claim.

In summary, there are three scenarios which are the most likely alternative results of the acceptance or rejection of the settlement, and whether OHA is able to prevail in the litigation. These can be quantified, very roughly [6], as follows; (1) that the settlement is rejected and the claim is litigated and the estate wins, in which case the estate distributes to OHA approximately Two Hundred Twelve Thousand Dollars ($212,000), (2) that the settlement is accepted, in which case the estate distributes to OHA approximately Three Hundred Sixty–Two Thousand Dollars ($362,000), and (3) that the settlement is rejected and the claim is litigated and the estate loses, in which case the estate pays OHA Six Hundred Seventy Thousand Dollars ($670,000). Thus, under the analysis so far, the estate could potentially gain from litiga-

tion One Hundred and Fifty Thousand Dollars ($150,000) (the second scenario minus the first), or lose from litigation Three Thousand Eight Dollars ($308,000) (the second scenario minus the third). Considering all that was discussed so far, including the legal authority on a bankruptcy court's review of a proposed compromise, the legal authority upon which the Trustee seeks to show that the compromise is not unreasonable, and the potential risks and benefits to the estate, this Court could conclude that the compromise is reasonable and should be approved. However, there remains a related issue which has not been addressed to the Court's satisfaction.

As discussed above, the heart of OHA's claim to administrative expense tax priority comes from its subrogation of the priority post-petition tax rights of OBES. As explained in *Northeastern Ohio:*

> As a general rule, subrogation applies where a party not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscious ought to be discharged by the latter.

126 B.R. at 516, quoting *First National City Bank v. United States*, 212 Ct.Cl. 357, 548 F.2d 928, 936 (1977). Thus, OHA is only entitled to subrogated priority rights to the extent that OBES could have had a priority claim against Parkview.[7] However, it is not clear to what extent OBES could have asserted a claim against Parkview. Though the parties have not thoroughly addressed this issue, this Court cannot ignore a provision of the Ohio Revised Code which controls member liability in the event the group rep-

---

**6.** As mentioned previously these calculations do not account for the change in the distribution to unsecured creditors in the event that OHA does not prevail. In this event, the percentage payout to unsecured creditors would increase, but the exact amount of this increase could not be determined until all claims are resolved and all assets are marshaled. Though the amount available for distribution to unsecured non-priority creditors would increase, the total amount of unsecured non-priority claims would also increase. Thus, the amount of change would be based upon the relative amounts of the estate and the other claims. Thus, this Court finds these calculations

helpful though not conclusive. They merely provide a general framework to judge the general risks of litigation in this case. It should also be reiterated that because not all claims have been resolved, and because the Trustee has not completed recovery of all the assets in this case, the sample percentage is itself a general estimate.

**7.** It does appear, however, that under terms of the contract OHA could have a non-priority claim directly against Parkview for the full amount of claims paid for its employees.

resentative fails to pay.[8] That provision provides that when the group representative fails to pay OBES, OBES bills each member for its share of the total benefits paid for the whole group for a given period. O.R.C. § 4141.241(D)(3). Parkview's percentage share would be equal to its total wages for a period divided by the total wages of all the member hospitals for the period. *Id.* Indeed, this appears to be the plain language of the statute.

If Parkview is a relatively small hospital, its portion could be rather small, and the loss the estate could experience as a result of litigation could be much less than estimated above. For this reason, this Court is unable to resolve the present Motion to Compromise. This Court has not been provided a reasonable legal basis as to why the statute would not be so interpreted, nor has it been provided the following information: the total wages paid by Parkview for the applicable period, the total wages paid by all the other OHA members for the given period, and the total benefits paid by OBES on behalf of employees of all the other members of OHA.

Finally, the Unsecured Creditor's Committee has put forth an argument which it believes could abrogate OHA's claim in full. The Committee asserts under *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.,* 127 B.R. 374 (N.D.Ohio 1991), that the entire amount of OHA's claim may not be allowable against the estate at all. As mentioned above, *Wolf Creek* stands for the proposition that when a creditor makes expenditures that are beneficial to the estate, such expenditures do not qualify as administrative expenses of the estate if they were undertaken primarily for the creditor's own self interest. Without analyzing *Wolf Creek* in detail, this Court will note this issue could also turn on the amount of Parkview's individual liability to OBES.

As explained above, this Court does not have all the information it needs to be persuaded that the Trustee has met his burden to show that the proposed compromise is not unreasonable. However, rather than deny the Trustee's Motion to Compromise, this

Court will set a Continued Hearing on the Trustee's Motion to Compromise. The parties may, of course, request to provide stipulations and briefs in lieu of the Continued Hearing. In reaching the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this opinion.

Accordingly, it is

**ORDERED** that a Continued Hearing on the Trustee's Motion to Compromise be set for Thursday, January 23, 1997 at 10:00 A.M. At the Hearing, this Court expects to hear arguments concerning the application of Ohio Revised Code § 4141.241(D)(3) to the present matter. The Court also expects to be presented evidence or stipulations as to: (1) the total wages paid by Parkview for the applicable period, (2) the total wages paid by all the other Ohio Housing Association members for the applicable period, and (3) the total benefits paid by the Ohio Bureau of Employment Services on behalf of employees of all the other members of Ohio Housing Association for the applicable period.

### DECISION AND ORDER

This cause comes before the Court upon the briefs filed in this matter as permitted by this Court in its December 19, 1996 Opinion and February 13, 1997 Order regarding the applicability of § 4141.241(D)(3) of the Ohio Revised Code to the present Trustee's Motion For Authority to Compromise Claim of Ohio Hospital Association (hereafter "OHA"). OHA, the counsel for the Committee of Unsecured Creditor's (hereafter the "Committee"), and the Trustee have filed briefs on this issue. Also, in its Order, this Court directed OHA to file certain evidence or stipulations. The Trustee and OHA have filed a Stipulation in accordance with the Order.

The present issue was partially addressed in this Court's December 19, 1996 Opinion. At issue was whether the Trustee had shown that the proposed settlement was reasonable. Because the dispositive issue relating to the value of OHA's claim was whether it could be

---

8. As noted supra, this Court has a duty to make an independent judgment as to whether the com-

promise is fair and equitable. *Reynolds,* 861 F.2d at 473 (6th Cir.1988).

entitled to administrative expense priority as a matter of law, this Court considered whether the Trustee has proffered any reasonable legal theory to support OHA's administrative expense claim. This Court did not go so far as to consider whether the claim would ultimately prevail, but only whether it had sufficient weight so as to make the compromise reasonable. This Court concluded that it could approve the settlement on the basis that there is a possibility that a court could conclude that OHA's claim is subrogated to a potential post-petition tax claim of the Ohio Bureau of Employment Services (hereafter "OBES"), which could be entitled to administrative expense priority per § 503(b)(1)(B)(i).

■ However, this Court also found that there was yet one issue which was not adequately addressed by the Trustee in support of his Motion. That issue related to § 4141.241(D)(3) of the Ohio Revised Code. This provision provides that in the event a group representative such as OHA fails to pay any bill issued to it, each member of the group will be liable for a pro rata share, based on wages paid to employees, of the group's total charges for benefits paid. It was this Court's concern that if Parkview's liability to OBES was based upon this provision, the potential claim of OBES could be substantially smaller, which would in turn render OHA's subrogated administrative priority claim substantially smaller. Indeed, as the Stipulation bears out, Parkview's pro rata share could be de minimis or nothing at all. Such a reduction could have a significant bearing on the reasonableness of the Trustee's proposed settlement with OHA. Because this Court did not have the factual information necessary to determine the relevance of this issue, this Court ordered that such facts be supplied. At the same time, because of the gravity of the issue, this Court provided the parties the opportunity to file briefs on this issue if they so desired.

In his brief, the Trustee argues that O.R.C. § 4141.241(D)(3) contains a condition precedent before it becomes operative. That is, the Trustee argues that the liability provided for in § 4141.241(D)(3) is not triggered until the group representative fails to pay a bill issued to it by OBES. The Trustee

argues that because OHA has not failed to pay the amounts billed, § 4141.241(D)(3) is inapplicable. However, this Court agrees with the Committee that the payment or nonpayment of the bills issued to OHA does not change the relative liability of the parties. The clear purpose of § 101(5) of the Bankruptcy Code, which provides that claims in bankruptcy can be contingent or unmatured, is that the court should look to the underlying basis of the claims. If OHA is to be considered to have a subrogated interest in OBES's potential claim against the estate, it is clear that the Court should look to the debtor's liability in the event OBES would assert its claim against the estate. That is, if OHA had not paid the charges attributable to Parkview, what is the amount OBES would have billed Parkview.

OHA argues that § 4141.241(A)(3) provides for the individual members' liability under the "reimbursing" election, and that there is no provision which relieves this liability. However, this argument begs the question of whether § 4141.241(D)(3) relieves this liability. OHA also argues that construing § 4141.241(D)(3) to relieve the liability provided for under § 4141.241(A)(3) would have the odd result, which could not have been intended, of allowing a member who defaults and lays off all employees to be liable for nothing, while a member who defaults and lays off only half its workforce would still be responsible for a significant liability. This Court does not find it necessary to address this argument.

Upon a review of the Briefs filed in this matter and the authorities cited therein, this Court finds that it is not unreasonable for purposes of the present Motion to Compromise that the following could be construed regarding § 4141.241(D)(3). Section 4141.241(D)(3) is ambiguous as to whether after termination of the group account individual members would continue to be liable for charges relating to their employees, or if they would only be liable for their pro rata share of the group's liability. Section 4141.241(D)(4) provides that "The administrator shall adopt regulations as he considers necessary with respect to.. termination of

group accounts." The administrator has done so, providing in pertinent part:

(E) If the group representative fails to pay, when due, any bill issued to it, separate bills shall be prepared and issued to each member of the group, pursuant to division (D)(3) of section 4141.241 of the Revised Code. In such event, failure to pay promptly in full all such individual billings, together with any applicable interest or forfeiture, shall be cause for termination of the group account ... Thereafter the group account shall terminate as of the date on which all billings outstanding against such account shall have been paid in full, together with any interest or forfeiture.

(F) Termination of a group account, for whatever reason, does not excuse any employer from liability on account of charges for benefits paid after the date on which charges cease to be made to the group account. After collecting unpaid amounts charged to a group account from all available security of such account, the administrator may transfer amounts remaining unpaid to the reimbursing account or accounts of the employer or employers in default, in which event the group account shall be terminated.

Ohio Administrative Code § 4141–37–11.

Thus, if the group representative fails to pay a bill issued to it, OBES is to issue bills to the individual employers in the relative amounts provided for in § 4141.241(D)(3). O.A.C. § 4141–37–11(E). If all individual members of the group account fail to pay, then the group account is terminated. *Id.* The termination is deemed to have occurred as of the date the group account was last paid in full. *Id.* Thus, at the date of the termination of the group account, all charges to the group account will have been paid. The individual members then remain liable for all charges for benefits paid after the date charges cease to the group account. O.A.C. § 4141–37–11(F). Implicit in this conclusion would appear to be the assumption that charges would be deemed to have ceased being made to the group account on the date of the termination of the group account, and are thus charged to the individual member's accounts. Indeed, the administrator is to transfer amounts remaining unpaid to the reimbursing accounts of the individual employers who are in default. *Id.* Thus, they remain individually liable for the charges for benefits paid for their employees, even after a group account has been terminated.

Accordingly, it is not unreasonable, and indeed it appears likely, that § 4141.241(D)(3) was only intended to impose its liability as an alternative to the termination of the group account. It is not unreasonable that failure to pay the liability imposed under § 4141.241(D)(3) only causes the termination of the group account, and that upon termination all individual members remain liable for their own unpaid charges for benefits paid. If this is so, then OBES would have a claim against the estate for all such charges for benefits paid to Parkview employees. Thus, a court could reasonably find that OBES could have a potential claim against the estate for the same amounts which presently constitute OHA's claim.

One issue remains to be addressed. The Committee continues to assert that OHA could have no priority claims against the estate per *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.*, 127 B.R. 374 (N.D.Ohio 1991). In *Wolf Creek*, a Chapter 11 debtor ceased operations because it had no money, then the major secured creditor began advancing payment of certain expenses in order to preserve the value of its collateral, which was in essence the bankruptcy estate. The secured creditor then filed a plan which provided that the debtor's assets would be bought by Wolf Creek Collieries Co. There was an agreement entered into between the secured creditor and Wolf Creek that on a certain date Wolf Creek would assume payment of the expenses which the secured creditor had been paying. This assumption was to occur and did occur before the plan was confirmed. The plan was confirmed, and Wolf Creek subsequently sought administrative expense priority for the expenses it paid per the agreement with the secured creditor. The Court then affirmed the Bankruptcy Court's analysis which focussed on the credi-

tor's self interest in making the payments. *Id.* at 379.

While this Court agrees that the self interest analysis may be necessary in some situations, such as for claims made pursuant to § 503(b)(3)(D), it is a more nebulous analysis than is usually required for administrative expenses per § 503(b)(1). Indeed, it is undeniable that on some level every creditor is acting in its own self interest. This is precisely why certain creditors are allowed administrative expense priority, so that they can have a self interest in doing what is in the estate's best interest. The holding in *Wolf Creek* becomes more clear when analyzed under the test *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976), adopted by the Sixth Circuit in *White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987). The first prong of this test provides that the expense must have resulted from a transaction with the debtor in possession. *Id.* In *Wolf Creek*, the transaction occurred between the Wolf Creek and the major secured creditor. The bankruptcy estate was a third party beneficiary to the transaction. The denial of administrative expense priority based on Wolf Creek's "self interest" can best be seen in this regard. Wolf Creek did not incur the expenses as the result of an obligation to the bankruptcy estate, and the estate was only a third party beneficiary to the transaction.

The Committee argues that OHA was acting in its own self interest in the present case, because its chief concern was to avoid its termination under the Ohio Revised Code for failure to make payment of a bill issued to it by OBES. Considering the *Wolf Creek* holding in light of Sixth Circuit precedent, this Court finds the Committee's argument unpersuasive, especially with regard to the fact that the present motion is one to compromise. In the present case, the basis for this Court's approval of the settlement is that OHA could have subrogation rights to the potential post-petition tax claim of OBES. If found to be such, these taxes would clearly be the result of transactions of the debtor in possession. This Court's basis for the approval of this ·compromise would also come from the assumption that OHA could be entitled to subrogation to the administrative priority claim of OBES. Subrogation is provided for in the § 510 of the Bankruptcy Code, and subrogation to priority rights is only abrogated to those certain claims delineated in § 507(d). Applying *Wolf Creek* as the Committee suggests could negate the allowance of subrogation claims in contravention of these provisions of the Code. Finally, it is not clear that the analysis used for administrative expense claims per § 503(b)(1)(A) would be the same as that used for subrogated administrative expense tax claims per § 503(b)(1)(B).

The Committee also argues that OHA had no duty to pay the bill at all, and thus could not be entitled to subrogation rights. Again, this Court finds this argument unpersuasive considering the present motion is one to compromise. The Committee's argument focuses on OHA as an entity in its own right, rather than as group of its members acting jointly. It would be frivolous and wasteful to have each member of the association file and litigate individual claims. Rather, this Court has little difficulty seeing OHA either as an agent acting in the collective interest of its members, or as its members simply acting collectively.

The Committee also argues that OHA was not under "some compulsion" to pay the debt for which another is primarily liable, as is required for its claim to be entitled to subrogation rights. For this proposition, the Committee cites *In re Northeastern Ohio General Hospital Assoc.*, 126 B.R. 513, 516 (Bankr. N.D.Ohio 1991). Again, this Court finds this argument unpersuasive considering the present motion to compromise. Had OHA not paid the claims associated with Parkview's closure, the group account would have been terminated, causing each individual member to acquire individual bonding and administration of their account. Indeed, this was the conclusion of the Court in *Northeastern Ohio. Id.*

Thus, for the reasons contained in this Court's analysis December 19, 1996 Opinion and herein, this Court finds that the compromise at issue is not so unreasonable that this Court should deny the present Motion to Compromise. In reaching the conclusion found herein, this Court has considered all of

the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that Trustee's Motion For Authority to Compromise Claim of Ohio Hospital Association, be and is hereby, *GRANTED.*